On this day the judges delivered their opinions seriatim.
Tilghman, C. J.
This is an action of ejectment for four lots in the borough of Easton, in Northampton county, distinguished on the plot of the town, by the numbers 77, 78, 79, and SO. The plaintiffs claimed an undivided moiety of the said lots, and made title under the will of Dr. Andrew Ledlie, deceased. The principal question in the cause was, whether the plaintiffs, who resided in Ireland, were barred of their action, by the act of limitations, passed the 26th of March, 1785, and the supplement thereto, passed the 15th of March, 1815. Before I proceed to the consideration of those acts, it will be necessary to make a few preliminary observations.. Some doubts were thrown out by the counsel for the plaintiffs, whether, under the construction contended for by the counsel for the defendants, the supplementary act in question would not be contrary to the constitution of the United States and the state of Pennsylvania; and whether, in such case, this court should not declare it to be void. But, as I do not adopt the construction alluded to, no constitutional question can arise. At the same time, it may be expected, that I should express my opinion, as to what would be the duty of the court, if a case should be brought before them, in which they were clearly of opinion, that an act of assembly was made in violation of the constitution of the state or of the United States. I shall not enter into an argument on that point, as it is not brought before us, for judgment. It will be sufficient to say, that I adhere to the opinion which I have frequently expressed, that when a judge is convinced, beyond doubt, that an act has been passed in violation of the constitution, he is bound to declare it void, by his oath, by his duty to the párty who has brought the 'cause before him, and to the people, the only source of legitimate power, who, when they formed the constitution of the state, expressly declared that certain things ‘‘were excepted out of the general powers of government, and should for ever remain inviolate.” The people declared, also, on their adoption of the constitution of the United States, “that it should be the supreme law of the land, and that the judges in every state should be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding.” Upon this subject I have never entertained but one opinion, which has been strengthened by reflection, and fortified by the concurring sentiments of the Supreme Court of the United States, *340 as well as of lawyers, judges, and statesmen of the highest standing in all parts of the United States of .Jlmeriea. Nevertheless, the utmost deference is due to the opinion of the legislature, — so great, indeed, that a judge would be unpardonable, who, in a doubtful case should declare a law to be void. Let this suffice for the present occasion. Should a case arise, in which I shall think myself bound to decide against the validity of an act of assembly, I 4sball be prepared to give my reasons.
The next remark which I have to make, is, that the defendants5 counsel put a construction«m the supplement to the act of limitations, which, applied to the present cause, is totally retrospective. Colour it as you please, it amounts to this; that a person beyond sea, who had a right of entry immediately before the passing of the supplement, was deprived of it, the moment it was passed. Such a violation of the principles of natural justice, is not to be attributed to the legislature, without the most clear and positive expressions. I grant, that the limitations of action is necessary. Society could not exist without it. But it would be contrary to the spirit of legislation in Pennsylvania, from the date of its charter to the statute in question, to deprive a man of his right to land, instantaneously, under a pretence of limiting the period within which he should bring his action. The defendants’ counsel, however, have endeavoured to show, that retrospective acts of limitation have been heretofore made; and if they have, it would certainly afford some ground for the argument, that it was intended to give a retrospective operation to the acl before us. It is necessary, therefore, to examine the laws which they have cited. The first is an act passed in the year 1705, (1 Sm. L. 48.) “Seven years’ quiet possession of lands within this province, which were first entered on upon an equitable right, shall for ever give an unquestionable title to the same, against all, during the estate whereof they are or shall be possessed, except in cases of infants, married women, lunatics, and persons not residing within this province or territories.” Here, we see, are express savings of the rights of absent persons, and others under disabilities. And, as to all others, I do not apprehend that the law was meant to be retrospective; for why should so much care be taken of absentees, while the rights of those who remained within the province, were disregarded? The construction should be, that seven years’ possession, subsequent to the act, should give title.
Next is an act for limitation of personal actions passed the 27th of March, 1813, (1 Sm. L. 76.) This law is clearly prospective, although, in some instances, but a short time is given for commencing an action. It therefore does not answer the purpose of the defendants’ argument. We then have an act, passed the 28th of May, 1715, (1 Sm. L. 91,) by vvhich an action was given to the assignee of a promissory note, in his own name, provided the suit be brought within six years from the time the cause of action accrued. This cannot fairly be called á retrospective limitation. *341 If the act had not been passed, an action might have been brought in the name of the payee of the note, for the use of the holder, at any time within six years from the accruing of the cause of action. If the holder suffered the limited time to expire, without suit, before the passing of the act, it was his own fault, and the act placed him in no worse a situation than he was before. But, at all events, when a law gives a man the right of suing in his own name, which he had not before, it may give it on such terms as the legislature thinks proper to prescribe. It is the case of a right given, not a right taken away.
By the act of the 4th of April, 1797, (3 Sm. L. 296,) actions against sureties in certain bonds given by executors and administrators, are limited to seven years from the date of the bonds. But as these were bonds to be given after the passing, and in pursuance of the act, its operation could not be retrospective. The defendants’ counsel have cited also the act of the 18th of April, 1791, (3 Sm. L. 34,) which limits writs of error to seven years from the time of the entry of judgment, which might, in some instances, (where judgments had been rendered seven years before the passing of the law,) be an immediate bar to a writ of error. It áp-pears, however, that in this act, there is a saving in favour of infants, femes covert, persons non compotes mentis, and those who were out of the United States of America. Besides, writs of error stand on a very different footing from actions for the recovery of vested rights. One who has title to land, and is dispossessed, has a right, to enter or prosecute an action. But a man against whom judgment has passed, has no right to a writ of error, but on such terms as the legislature will grant. He had an opportunity of defending himself before jutfgment; and the benefit of a rehearing, or a writ of error, is matter of favour, rather than of right, and to be regulated by the legislature, according to their ideas of expediency and policy. It would take up too much time to go through all the British statutes of limitation; but, in general, it may be safely asserted, that persons who claim a right to land have not been bound, without an allowance of some time to commence their actions. Until the passing of our act of the 26th of March, 1785, the period of sixty years, under the English statute of Hen. 8, was our limitation of action for the recovery of real estate. This was certainly an unreasonable length of time, and to reduce it to narrower bounds was the object, of the act of March, 1785, and its supplement, which I am now about to consider. Upon their construction, the case before us depends.
By the second section of the act of 1785, the entry into lands, or prosecution of an action for the recovery thereof, was limited to twenty-one years from the time when the title first descended or accrued to the plaintiff, or his ancestors under whom he claimed. But, as this would have been an immediate bar to many persons, who, trusting to the statute of Hen. 8. had suffered twenty-one years to elapse, without entry or action, — to avoid this *342 injustice, the third section contained a proviso, as follows: “ that any person or persons now having right or title of entry as aforesaid, and the heir or heirs of such person or persons, may, within fifteen years from this time, enter or commence any action or suit, as he, she, or they, or his, her, or their ancestors or predecessors might have done, before the passing of this act.”
These two sections are inseparable. The second, without the thii’d, would work injustice. Taken together, they form a whole replete with good sense and equity. Twenty-one years were to be the general period of limitation; but in no instance was a man to be debarred of his right, without an allowance of at least fifteen years to prosecute it. Still the system was incomplete. There were cases, in which persons were under disabilities of infancy, or unsoundness of mind, or were beyond the seas, or without the United States of America, when their title first áccrued, and under such circumstances it would be hard not to allow them some indulgence. Indulgence therefore was granted, in the fourth section, by which it was enacted, “that such person or persons, and the heir or heirs of such person or persons, shall, and may, notwithstanding the said twenty-one years be expired, bring his or their action, or make his or their entry, as he, she, or they might have done before the passing of this act, so as such person or persons, or the heir or heirs of such person or persons, shall, within ten years next after attaining full age, discoverture, soundness of mind, enlargement out of prison, or coming into the said United States take benefit of, or sue for the same, and no time after the said ten years.”
This act was extremely liberal, indeed too liberal to persons out of the United States, at the*expense of those who resided in Pennsylvania. Considering the facility of intercourse between Europe and America, it was a grievance that our citizens, residing among us, should have no protection against the interminable claims of absentees or foreigners, who were too careless to look into or prosecute their rights. Those people could have no reason to complain, if they were put on the same footing with persons residing in the United States. But, as they might have delayed the prosecution of their actions, on the faith of the act of 1785, it would have been most unjust to bar them, without allowing a reasonable time to assert their claims; and as to what should be deemed a reasonable time, the act of 1785, which gave fifteen years, might furnish a good precedent. Such, I apprehend, were the sentiments of the legislature, when they passed the supplementary act of the 11th of March, 1815, (6 Stat. Law, 277.) This is a short act, in the following terms: “That the provision contained in the fourth section of the act to which this is a supplement, so far as the same relates to persons beyond the sea, and from and without the United States of America, be, and the same is hereby repealed, and that the limitation contained in the second section of the said act, be, and flic same is hereby extended to persons residing be *343 yond the seas, and from and without the United States of Jlme-rica, any law to the contrary notwithstanding.” Here, we see, are two provisions, by one of which the benefit of the fourth section of the original act, was, in future, taken away from persons without the United States; and by the other, the limitation contained in the second section was extended to the same persons. This was, in substance, throwing a new provision into the second section, which could not be done without flagrant injustice, unless it remained connected with the third section, and then all would.be right. Keeping up this connexion, the law would stand thus. ' All persons residing without the United States, must prosecute their claims within twenty-one years from the time their titles first descended or accrued: but inasmuch as some of them may have delayed such prosecution, on the faith of the act of 1785, for twenty-one years next preceding this supplementary act, or for so great a part of twenty-one years, as would leave them less than fifteen years for the prosecution of their actions, or making their entry, all such shall have fifteen years from the passing of . this supplement. And what is the objection to this construction ? No other, than that the fifteen years mentioned in the third section, have run out before the passing of the supplement. True, they had; but as a new clause was introduced, by the supplement, into the second section, by which, for the first time, it was made expressly to operate against persons residing out of the United States, there is great reason to conclude, that the intent of the legislature was, to proceed on the same principles of equity by which their predecessors were governed, which could not be done without considering the words, now having right in the third section, as re-enacted, so far as regarded persons out of the United States; and thus the fifteen years would recommence, as to those persons, at the date of the supplement. Under this construction of the two acts, we have a system of limitation, prudent, fair, and honest, which is more than can be said of the construction contended for by the defendants. I am of opinion, therefore, that the judge of the Court of Common Pleas was in error, when he declared that the plaintiffs were barred by the act of limitation. But it is objected, that supposing there was error, still the judgment ought not to be reversed, because the point on the statutes of limitation did not arise, as it does not appear on the record that the plaintiffs were not within the United States. If the point did not arise, it is very singular that the defendants’ counsel should have requested the court to give their opinion on it, — that the court did give their opinion in favour of the defendants, who had the full benefit of it with the jury, — and that the court should have certified, that the opinion so given was excepted to by the plaintiffs. The truth is, that the record has come up in very bad condition. We have not the evidence, except as it may be gleaned from a very imperfect sketch in the judge’s charge. But such as it. is, we-must shut our *344 eyes very close, not to perceive that.the judge assumed it as a fact, that the plaintiffs were beyond the seas. There is enough, therefore, to satisfy us, that the question on the acts of limitation did arise, and was important in the cause. The opinion of the court below, was also asked, and given, on several other points stated in the record. The defective state of the facts on which those points were decided, renders it difficult for this court to form a satisfactory judgment. All that I can say is, that upon such facts as do appear, I do not perceive any error in the opinion of the judge, except as regards the acts of limitation. There, I think there was manifest error, for which the judgment should be reversed, and a venire de novo awarded.
Gtbsokí, J.
Whether there are equitable objections to the plaintiffs’ recovery, as respects a part of the premises, I am unable to say. The statement of the case in the charge is by no means a full one; and we know not what sort of title might be shown on another trial. But those objections would go only to a part; and this leads to the point in the assignment of error — the operation of the act of the 11th of March, 1815, on the act of the 26th of March, 1785.
That it was the actual intent of the legislature to interpose an immediate bar, will, I think, be admitted. A simple repeal of the saving, would have sufficiently indicated such an intent. But the repealing act goes further, and in express terms calls into immediate operation the limitation in the second section of the original act, without containing a word on the subject of the third section which had become obsolete, but which is uow said to be revived. To those who had a right of entry in 1785, but remained absent-one and twenty years, that section gave fifteen years from the period of their arrival here. ' How then can we say, that it is to be considered as re-enacted in terms, with modifications, to adapt it to the circumstances of those who had a right of entry in 1815, (for that is the argument,) when the repealing act contains not a syllable pn the subject? If the legislature had intended to revive this section, its meaning would have been expressed in terms. But what is there to give rise even to a suspicion of such an intent? Nothing but the apparent hardship of suddenly withdrawing the protection extended to the absent owner, after having induced him to trust to it as a permanent safeguard. But no impediment to the-immediate pursuit of his claim was thrown in his way, and the legislature gave no pledge that what was entirely gratuitous at first, should be continued a single day. It was not only gratuitous, but unjust to our own citizens who remained at home to cultivate and defend the soil. Of all the disabilities originally provided for, absence is entitled to least- indulgence, as it is always incurred voluntarily; for if it were occasioned by coverture, infancy, insanity, or imprisonment, any of these, without absence superadded, *345 would be sufficient for every purpose of protection. Every other disability interposes an actual impediment; this does not: and if an absent owner will remain abroad, without providing an agent to attend to his husiness at home, he should take the consequences. In repealing the saving without provision for existing cases, therefore, I discover no hardship. It is obvious, Jthis saving was originally introduced from a servile imitation of the British statute, and not from any consideration of its justice or policy; and the repeal of an obnoxious provision, creates no obligation to substitute any thing as an equivalent; nor is it probable the legislature would be disposed to do so. But were the repeal even positively unjust, what right would we have to construe the act so as to frustrate its object? Under very particular circumstances, a court may properly supply details that are necessary, to prevent the plain and admitted intent of the legislature from failing of effect. Something like this was done in Waln v. Shearman, (8 Serg. & Rawle, 359,) and in Pennock v. Hart, (8 Serg. & Rawle, 369.) But in the former of these cases, it is impossible to doubt, that in passing the act for the sale of unseated land for taxes, the intention was, in any event, to secure to the original owner, a right to contest the regularity of the sale, within five years from the time when an ejectment might first have been brought against the purchaser; and that in afterwards abolishing the old form of ejectment, by which an action could have been brought for vacant land, there was no intention to impair this right; and it is clear the actual intent of the legislature would have been frustrated by any other construction. The other case was within the letter, but not within the spirit of the act; but I am less confident of the soundness of that decision, than when it was pronounced. In the case before us, I find no reason to say that the third section of the act of 1785, is substantially re-enacted by the act ofofrW-dr j f 1
But it is said, that without it, the latter act would be unconstitutional; and, instead of controverting this, I will avail myself of it to express an opinion which I have deliberately formed, on the abstract right of the judiciary to declare an unconstitutional act of the legislature void.
It seems to me there is a plain difference, hitherto unnoticed, between acts that are repugnant to the constitution of the particular state, and acts that are repugnant to the constitution of the United States; my opinion being, that the judiciary is bound to execute the former, but not the latter. I shall hereafter attempt to explain this difference, by pointing out the particular provisions in the constitution of the United States on which it depends. I am aware, that a right to declare all unconstitutional acts void, without distinction as to either constitution, is generally held as a professional dogma; but, I apprehend, rather as a matter of faith than of reason. I admit that I once embraced the same doctrine, but without examination, and I shall therefore state the arguments *346 that impelled me to abandon it, with great respect for those by whom it is still maintained. But I may premise, that it is not a little remarkable, that although the right in question has all along been claimed by the judiciary, no judge has ventured to discuss it, except Chief Justice Marshall, (in Marbury v. Madison, 1 Cranch, 176,) and if the argument a jurist so distinguished for the strength of his ratiocinative powers be found inconclusive, it may fairly be set down to the weakness of the position which he attempts to defend. Si Pergama dextra defendi potuit, eliam hac defensa fuisset. in saying this, I do not overlook the opinion of Judge Patterson, in Vanhorne v. Dorrance, (2 Dall. 307,) which abounds with beautiful figures in illustration of his doctrine; bu,t, without intending disrespect, I submit that metaphorical illustration is one thing and argument another. , Now, in questions of this sort, precedents ought to go for absolutely nothing. The constitution is a collection of fundamental laws, not to be departed from in practice nor altered by judicial decision, and in the construction of it, nothing would be so alarming as the doctrine of communis error? which offers a ready justification for every usurpation that has not been resisted in limine. Instead, therefore, of resting on the fact, that the right in question has universally been assumed by the American courts, the judge who asserts it ought to be prepared to maintain it on the principles of the constitution.
I begin, then, by observing that in this country, the powers of the judiciary are divisible into those that are political and those that are purely civil. Every power by which one organ of the government is enabled to control another, or to exert an influence over its acts, is a political power. The political powers of the judiciary are extraordinary and adventitious; such, for instance, as are derived from certain peculiar provisions in the constitution of the United States, of which hereafter: and they are derived, by direct grant, from the common fountain of all political power. On the other hand, its civil, are its ordinary and appropriate powers; being part of its essence, and existing independently of any suppoa&d grant in the constitution. But where the government exists/by virtue of a written constitution, the judiciary does not necessarily derive from that circumstance, any other than its ordinary and appropriate powers. Our judiciary is constructed on the principles of the common law, which enters so essentially into the composition of our social institutions as to be inseparable from them, and to be, in fact, the basis of the whole scheme of our civil and political liberty. In adopting any organ or instrument of the common law, we take it with just such powers and capacities as were incident to it at the common law, except where these are expressly, or by necessary implication, abridged or enlarged in the act of adoption; and, that such act is a written instrument, cannot vary its consequences or construction. In the absence of special provision to the contrary, sheriffs, justices of the peace, and *347 other offset's whose offices are established in the constitution, exercise no other powers here, than what similar officers do in England; and trial by jury would have been according to the course of the common law, without any declaration to that effect in the constitution. Now, what are the powers of the judiciary at the common law? , They are those that necessarily arise out of its immediate business; and they are therefore commensurate only with the'judicial execution of the municipal law, or, in other words, with me administration of distributive justice, without extending to any filing^of a political cast whatever. Dr. Paley, as able a man as over wrote on those subjects on' which he professed to treat, seems to Iffwe considered the judiciary as a part of the executive, and judging from its essence, subordinate to the legislature, which he viewed, as the depositary of the whole sovereignty of the state. With us, although the legislature be the depository of only so much of the sovereignty as the people have thought fit to impart, it is nevertheless sovereign within the limit of its powers, and may relatively claim the same pre-eminence here that it may claim elsewhere. It will be conceded, then, that the ordinary and essential powers of the judiciary do not extend to the annulling of an act of the legislature. Nor can the inference to be drawn from this, be evaded by saying that in England the constitution, resting in principles consecrated by time, and not in an actual written compact, and being subject to alteration by the very act of the legislature, there is consequently no separate and distinct criterion by which the question of constitutionality may be determined; for it does not follow, that because we havé such a criterion, the application of it belongs to the judiciary. I take it, therefore, that the power in question does not necessarily arise from the judiciary being established by a written constitution, but that this organ can claim on account of that circumstance, no powers that do not belong to it at the common law; and that, whatever may have been the cause of the limitation of its jurisdiction originally, it can exercise no power of supervision over the legislature, without producing a direct authority for it in the constitution, either in terms or by irresistible implication from the nature of the government: wilftout which the power must be considered as reserved, along with the other un-granted portions of the sovereignty for the immediate use of the people.
The constitution of Pennsylvania contains no express grant of political powers to the judiciary. But, to establish a grant by implication, the constitution is said to be a law of superior obligation; and, consequently, that if it were to come into collision with an act of the legislature, the latter would have to give way. This is conceded. But it is a fallacy, to suppose that they can come into collision before the judiciary. What is a constitution ? It is an act of extraordinary legislation, by which the people establish the structure and mechanism of their government; and in which *348 they prescribe fundamental rules to regulate the motion of the several parts. What is a statute? It is an act of ordinary legislation, by the appropriate organ of the government; the provisions of which are to be executed by the executive or judiciary, or by officers subordinate to them. The constitution, then, contains no practical rules for the administration of distributive justice, with which alone the judiciary has to do; these being furnished in acts of ordinary legislation, by that organ of the government, which, in this respect, is exclusively the representative of the people; and it is generally true, that the provisions of a constitution are tb be carried into effect immediately by the legislature, and only medi-ately, if at all, by the judiciary. In what respect is the constitution of Pennsylvania inconsistent with this principle? Only, perhaps, in one particular provision, to regulate the style of process, and establish an appropriate form of conclusion in criminal prosecutions: in this alone the constitution furnishes a rule for the judiciary, and this the legislature cannot alter, because it cannot alter the constitution. In all other cases, if the act of assembly supposed to be unconstitutional, were laid out of the question, there would remain no rule to determine the point in controversy in the cause, but the statute or common law, as it existed before the act of assembly was passed; and the constitution and act of assembly therefore do not furnish conflicting rules applicable to the point before the court; nor is it at all necessary, that the one or the other of them should give way.
The constitution and the right of the legislature to pass the act, may be in collision. But is that a legitimate subject for judicial determination? If it be, the judiciary must be a peculiar organ, to revise the proceedings of the legislature, and to correct its mistakes; and in what part of the constitution are we to look for this proud pre-eminence? Viewing the matter in the opposite direction, what would be thought of an act of assembly in which it should be declared that the Supreme Court had, in a particular case, put a wrong construction on the constitution of the United States, and that the judgment should therefore be reversed ? It would doubtless be fought a usurpation of judicial power. But it is by no means clear, that to declare a law void which has been enacted according to the forms prescribed in the constitution, is not a usurpation of legislative power. It is an act of sovereignty; and sovereignty and legislative power are said by Sir William Blackstone to be convertible terms. It is the business of the judiciary to interpret the laws, not scan the authority of the lawgiver; and without the latter, it cannot take cognizance of a collision between a law and the,constitution. So that to affirm that the judiciary has a right to judge of the existence of such collision, is to take for granted the very thing to be proved. And, that a very cogent argument may be made in this way, I am not disposed to deny; for no conclusions are so strong as those that are drawn from the pe-titio principii.
*349 But it has been said to be emphatically the business of the judiciary, to ascertain and pronounce what the law is; and that this necessarily involves a consideration of the constitution. It does so: but how far? If the judiciary will inquire into any thing beside the form of enactment, where shall it stop ? There must be some point of ^imitation to such an inquiry; for no one will pretend, that a judge would be justifiable in calling for the election returns, or scrutinizing the qualifications of those who composed the legislature.
It is next supposed, that as the members of the legislature have no inherent right of legislation, but derive their authority from the people, no law can be valid where authority to pass it, is either simply not given or positively withheld: thus treating the members as the agents of the people, and the constitution as a letter of attorney containing their authority and bounding their sphere of action, and the consequence deduced being, that acts not warranted by the constitution arc not the acts of the people, but of those that do them; and that they are therefore ipso facto void. The concluding inference is, in military phrase, the key of the position, and if it be tenable, it will decide the controversy; for a law ipso facto void, is absolutely a non entity. But it is putting the argument on bold ground to say, that a high public functionary shall challenge no more respect than is due to a private individual; and that its acts, although presenting themselves under sanctions derived from a strict observance of the form of enactment prescribed in the constitution, ai;e to be rejected as ipso facto void for excess of authority. The constitution is not to be expounded like a deed, but by principles of interpretation much more liberal; as was declared by this court, in The Farmers and Mechanics’ Bank v. Smith, (3 Serg. & Rawle, 63.) But, in the case of a public functionary, even according to common law maxims, omnia presumí debeant rite et solemniter esse acta. The benefit of this maxim cannot be refused to the legislature by those who advocate the other side, inasmuch as it is the foundation of their own hypothesis; for all respect is demanded for the acts of the judiciary. For instance: let it be supposed that the power to declare a law unconstijptional has been exercised. What is to be done? The legislature must acquiesce, althought it may think the construction of the judiciary wrong. But why must it acquiesce? Only because it is bound to pay that respect to every other organ of the government, which it has a right to exact from each of them in turn. This is the argument. Buj; it will not be pretended, that the legislature has not at least an equal right with the judiciary to put a construction on the constitution; nor that either of them is infallible; nor that either ought to be required to surrender its judgment to the other. Suppose, then, they differ in opinion as to the constitutionality of a particular law; if the organ whose business it first 'is to decide on the subject, is not to have its judgment treated with respect, what *350 shall prevent it from securing the preponderance of its opinion by the strong arm of power? It is in vain to say, the legislature would be the aggressor in this; and that no argument in favour of its authority can be drawn from an abuse of its power. Granting this, yet it is fair to infer, that the framers of the constitution never intended to force the judges either to become martyrs or to flinch from their duty; or to interpose a check that would produce no other effect than an intestine war. Such things have occurred in other ’ states, and would necessarily occur in this, under circumstances of strong excitement in the popular branch. The judges would be legislated out of office, if the majority requisite to a direct removal by impeachment, or the legislative address, could not be had; and this check, instead of producing the salutary effect expected from it, would rend the government in pieces. But, suppose that a struggle would not produce consequences so disastrous, still the soundness of any construction which would bring one organ of the government into collision with another, is to be more 'than suspected; for where collision occurs, it is evident the machine is working in a way the framers of it did not intend. But what I want more immediately to press on the attention, is the necessity of yielding to the acts of the legislature the same respect that is claimed for the acts of the judiciary. Repugnance to the constitution is not always self evident; for questions involving the consideration of its existence, require for their solution the most vigorous exertion of the higher faculties of the mind, and conflicts will be inevitable, if any branch is to apply the constitution after its own fashion to the acts of all the others. I take it, then, the legislature is entitled to all the deference that is due to the judiciary; that its acts are in no case to be treated as ipso facto void, except where they would produce a revolution in the government; and that, to avoid them, requires the act of some tribunal competent under the constitution, (if any such there be,) to pass on their validity. All that remains, therefore, is to inquire whether the judiciary or the people are that tribunal.
Now, as the judiciary is not expressly constituted for that purpose, it must d^-ive whatever authority of the sort it may possess, from the reasonableness and fitness of the thing. But, in theory, all the organs of the government are of equal capacity; or, if not equal, each must be supposed to have superior capacity only for those things which peculiarly belong to it; and, as legislation peculiarly involves the consideration of those limitations which are put on the law-making power, and the interpretation of the laws when made, involves only the construction of the laws-themselves, it follows that the construction of the constitution in this particular belongs to the legislature, which ought therefore to be taken to have superior capacity to judge of the constitutionality of its own acts. But suppose all to be of equal capacity in every respect, why should one exercise a controlling power over the rest? That the,judiciary' *351 is of superior rank, has never been pretended, although it has been said to be co-ordinate. It is not easy, however, to comprehend how the power which gives law to all the rest, can be of no more than equal rank with one which receives it, and is answerable to the former for the observance of its statutes. Legislation is essentially an act of sovereign power; but the execution of the laws by instruments that are governed by prescribed rules and exercise no power of volition, is essentially otherwise. The very definition, of ldw, which is said to be “ a rule of civil conduct prescribed by the supreme, power in the state,” shows the intrinsic superiority of the legislature. It may be said, the power of the legislature, also, is limited by prescribed rules. It is So. But it is, nevertheless, the power of the people, and sovereign as far as it extends. It cannot be said, that the judiciary is co-ordinate merely because it is established by the constitution. If that were sufficient, sheriffs, registers of wills, and recorders of deeds, would be so too. Within the pale of their authority, the acts of these officers will have the power of the people for their support; but no one will pretend, they are of equal dignity with the acts of the legislature. Inequality of rank arises not from the manner in which the organ has been constituted, but from its essence and the nature of its functions; and the legislative organ is superior to every other, inasmuch as the power to will and to command, is essentially superior to the power to act and to obey. It does not follow, then,: that every organ created by special provision in the constitution, is of .equal rank. Both the executive, strictly as such, and the judiciary are subordinate; and an act of superior power exercised by an inferior ought, one would think, to rest on something more solid than implication.
It may be alleged, that no such power is claimed, and that the judiciary does no positive act, but merely refuses to be instrumental in giving effect to an unconstitutional law. This is nothing more than a repetition in a different form of the argumeht, — that an unconstitutional law is ipso facto void; for a refusal to act under the law, must be founded on a right in each branch to judge of the acts of all the others, before it is bound to exercise its functions to give those acts effect. No such right is recognised in the different branches of the national government, except the judiciary, (and that, too, on account of the peculiar provisions of the constitution,) for it is now universally held, whatever doubts may have once existed, that congress is bound to provide for carrying a treaty into effect, although it may disapprove of the exercise of the treaty-making power in the particular instance. A government constructed on any other principle, would be in perpetual danger of standing still; for the right to decide on the constitutionality of the laws, would not be peculiar to the judiciary, but would equally reside in the person of every officer whose agency might be necessary to carry them into execution.
Every one knows how seldom men think exactly alike On ordi *352 nary subjects; and a government constructed on the principle of assent by all its parts, would be inadequate to the most simple operations. The notion of a complication of counter checks has been carried to an extent in theory, of which the framers of the constitution never dreamt. When the entire sovereignty was separated into its elementary parts, and distributed to the appropriate branches, all things incident to the exercise of its powers were committed to each branch exclusively. The negative which each part of the legislature may exercise, in regard to the acts of the other, was thought sufficient to prevent material infractions of the restraints which were put on the power of the whole; for, had it been intended to interpose the judiciary as an additional barrier, the matter would surely not have been left in doubt. The judges would not have-been left to stand on the insecure and ever shifting ground of public opinion as to constructive powers: they would have been ■placed on the impregnable ground of an express grant. They would not have been compelled to resort to the debates in the convention, or the opinion that was generally entertained at the time. A constitution, or a statute, is supposed to contain the whole will of the body from which it emanated; and I would just as soon resort to the debates in the legislature for the construction of an act of assembly, as to the debates in the convention for the construction of the constitution.
The power is said to be restricted to cases that are free from doubt or difficulty. But the abstract existence of a power cannot depend on the clearness or obscurity of the case in which it is to be exercised; for that is a consideration that cannot present itself, before the question of the existence of the power shall have been determined; and, if its existence be conceded, no considerations of policy arising from the obscurity of the particular case, ought to influence the exercise of it. The judge would have no discretion; but the party submitting the question of constitutionality would have an interest in the decision of it, which could not be postponed to motives of deference for the opinion of the legislature. His rights would depend not on the greatness of the supposed discrepancy with the constitution, but on the existence of any discrepancy at all; and the judge would therefore be bound to decide this question, like every other in respect to which he may be unable to arrive at a perfectly satisfactory conclusion. But he Would evade the question instead of deciding it, wrere he to refuse to decide in accordance with the inclination of his mind. To say, therefore, that the power is to be exercised but in perfectly clear cases, is to betray a doubt of the propriety of exercising it at all. Were the same caution used in judging of the existence of the power that is'inculcated as to the exercise of it, the profession would perhaps arrive at a different conclusion. The grant of a power so extraordinary ought to appear so plain, that he who should run might read. Now, put the constitution into the hands of any *353 man of plain sense, whose mind is free from an impression on the subject, aifü it will be impossible to persuade him, that the exercise of such a power was ever contemplated by the convention.
But the judges are sworn to support the constitution, and are they not bound by it as the law of the land? In some respects they are. In the very few cases in which the judiciary, and not the legislature, is the immediate organ to execute its provisions, they are bound by it in preference to any act of assembly to the contrary. In such cases, the constitution is a rule to the courts. But what I have in view in this inquiry, is the supposed right of the judiciary to interfere, in cases where the constitution is to be carried into effect through the instrumentality of the legislature, and where that organ must necessarily first decide on the constitutionality of its own act. The oath to support the constitution is not peculiar to the judges, but is taken indiscriminately by every officer of the government, and is designed rather as a test of the political principles of the man, than to bind the officer in the discharge of his duty: otherwise it were difficult to determine what operation it is to have in the case of a recorder of deeds, for instance, who, in the execution of his office, has nothing do do with the constitution. But granting it to relate to the official conduct of the judge, as well as every other officer, and not to his political principles, still it must be understood in reference to supporting the constitution, only as far as that may be involved in his official duty; and, consequently, if his official duty does not comprehend an inquiry into the authority of the legislature, neither does his oath. It is worthy of remark here, that the foundation of every argument in favour of the right of the judiciary, is found at last to be an assumption of the whole ground in dispute. Granting that the object of the oath is to secure a support of the constitution in the discharge of official duty, its terms may be satisfied by restraining it to official duty in the exercise of the ordinary judicial powers. Thus, the constitution may furnish a rule of construction, where a particular interpretation of a law would conflict with some constitutional principle; and such interpretation, where it may, is always to be avoided. But the oath was’more probably designed to secure the powers of each of the different branches from being usurped by any of the rest: for instance, to prevent the house of representatives from erecting itself into a court of judicature, or the Supreme Court from attempting to control the legislature; and, in this view, the oath furnishes an argument equally plausible against the right of the judiciary. But if it require a support of the constitution in any thing beside official duty, it is in fact an oath of allegiance to a particular form of government; and, considered as such, it is not easy to see why it should not be taken by the citizens at large, as well as by the officers of the government. It has never been thought that an officer is under greater restraint as to measures which have for their avowed end a *354 total change of the constitution, than a citizen who has taken no oath at all. The official oath, then, relates only to the official conduct of the officer, and does not prove that he ought to stray from the path of his ordinary business to search for violations of duty in the business'of others; nor does it, as supposed* define the powers of the officer.
But do not the judges do a positive act in violation of the constitution, when they give effect to an unconstitutional law ? Not if the law has been passed according to the forms established in the constitution. The fallacy of the question is, in supposing that the judiciary adopts the acts of the legislature as its own; whereas the enactment of a law and the interpretation of it are not concurrent acts, and as the judiciary is not required to concur in the enactment, neither is it in the breach of the constitution which may be the consequence of the enactment. The fault is imputable to the legislature, and on it the responsibility exclusively rests. In this respect, the judges are in the predicament of jurors who arc bound to serve in capital cases, although unable, under any circumstances, to reconcile it to their duty to deprive a human being of life. To one of these, who applied to be discharged from the panel, I once heard it remarked, by an eminent and humane judge, You do not deprive a prisoner of life by finding him guilty of a capital crime: you but pronounce his case to be within the law, and it is therefore those who declare the law, and not you, who deprive him of life.”
That every thing addressed to the legislature by way of positive command, is purely directory, will hardly be disputed: it is only to enforce prohibitions that the interposition of judicial authority is thought to be warrantable. But I can see no room for a distinction between the injunctions that are positive and those that are negative: the same authority must enforce both.
But it has been said, that this construction would deprive the citizen of the advantages which are peculiar to a written constitution, by at once declaring the power of the legislature, in practice, to be illimitable. I ask, what are those advantages? The principles of a written constitution are more fixed and certain, and more apparent to the apprehension of the people, than principles which depend on tradition and the vague Comprehension of the individuals who compose the nation, and who cannot all be expected to receive the same impressions or entertain the same notions on any given subject. But there is no magic or inherent power in parchment and ink, to command respect and protect principles from violation. In the business of government, a recurrence to fii'st painciples answers the end of an observation at sea with a view to correct the dead reckoning; and, for this purpose, a written constitution is an instrument of inestimable value. It is of inestimable value, also, in rendering its principles familiar •te the mass of the people; for, after all, there is no effectual guard *355 against legislative usurpation but public opinion, the force of which, in this country, is inconceivably great. Happily this is proved, by experience, to be a sufficient guard against palpable infractions. The constitution of this state has withstood the shocks of strong party excitement for thirty years, during which no act of the legislature has been declared unconstitutional, although the judiciary has constantly asserted a right to do so in clear cases. But it would be absurd to say, that this remarkable observance of the constitution has been produced, not by the responsibility of the legislature to the people, but by an apprehension of control by-the judiciary. Once let public opinion be so corrupt as to sanction every misconstruction of the constitution and abuse of power which the temptation of the moment may dictate, and the party which may happen to be predominant, will laugh at the puny efforts of a dependent power to arrest it in its course.
For these reasons, I am of opinion that it rests with the people, in whom full and absolute sovereign power resides, to correct abuses in legislation, by instructing their representatives to repeal the obnoxious act. What is wanting to plenary power in the government, is reserved by the people for their own immediate use; and to redress an infringement of their rights in this respect, would seem to be an accessory of the power thus reserved. It might, perhaps, have been better to vest1 the power in the judiciary; as it might be expected that its habits of deliberation, and the aid derived from the arguments of counsel, would more frequently lead to accurate conclusions. On the other hand, the judiciary is not infallible; and’ an error by it would admit of no remedy but a more distinct expression of the public will, through the extraordinary mediqm of a convention; whereas, an error by the legislature admits of a remedy by an exertion of the same will, in the ordinary exercise of the right of suffrage, — a mode better calculated to attain the end, without popular excitement. It may be said, the peop'le would proba? bly not notice an error of their representatives. But they would as probably do so, as notice an error of the judieiary; and, beside, it is a postulate in the theory of our government, and the very basis of the superstructure, that the people are wise, virtuous, and competent to manage their own affairs: and if they are not so, in fact, still every question of this sort must be determined according to the principles of the constitution, as it came from the hands of its framers, and the existence of a defect which was not foreseen, would not justify those who administer the government, in applying a corrective in practice, which can be provided only by a convention. Long and uniterrupled usage is entitled to .respect; and, although it cannot change an admitted principle of the constitution, it will go far to settle a question of doubtful right. But, although this power has all along been claimed by the state judiciary, it has never been exercised. Austin v. The University of Pennsylvania, (1 Yeates, 260,) is the only case even apparently to the *356 contrary; but there the act of assembly had been previously repealed. In Vanhorne v. Dorrance, decided by the Circuit Court of the United Slates under similar circumstances, the right is peremptorily asserted and examples of monstrous violations of the constitution are put in a strong light by way of example; such as taking away the trial by jury, the elective franchise, or subverting religious liberty. But any of these would be such a usurpation of the political rights of the citizens, as would work a change in the very structure of the government; or, to speak more properly, it would itself be a revolution, which, to counteract, would justify even insurrection; consequently, a judge might lawfully employ every instrument of official resistance within his reach. By this I mean, that while the citizen should resist with pike and gun, the judge might co-operate with habeas corpus and mandamus. It would be his duty, as a citizen, to throw himself into the breach, and, if it should be necessary, perish there; but this is far from proving the judiciary to be a peculiar organ under the constitution, to prevent legislative encroachment on the powers reserved by the people; and this is all that I contend it is not. Indeed, its absolute inadequacy to the object, is conclusive that it never was intended as such by the framers of the constitution, who must have had in view the probable operation of the government in practice.
But in regard to an act of assembly, which is found to be in collision with the constitution, laws, or treaties of the United States, I take the duty of the judiciary to be exactly the reverse. By becoming parties to the federal constitution, the states have agreed to several limitations of their individual sovereignty, to enforce which, it was thought to be absolutely necessary to prevent them from giving effect to laws in violation of those limitations, through the instrumentality of their own judges. Accordingly, it is declared in the fifth article and second second section of the federal constitution, that “This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby: any thing in the laws or constitution of any state to the contrary notwithstanding.”.
This is an express grant of a political power, and it is»conclusive to show that no law of inferior obligation, as every state law must necessarily be, can be executed at the expense of the constitution, laws, or treaties of the United States. It may be said, these are to furnish a rule only when there is no state provision on the subject. But, in that view, they could with no propriety be called supreme; for supremacy is a relative term, and cannot be predicated of a thing which exists separately and alone: and this law, which is called supreme, would change its character and become subordinate as soon as it should be found in conflict with a state law. *357 But the judges are to be bound by the federal constitution and laws, notwithstanding any thing in the constitution or laws of the particular state to the contrary. If, then, a state were to declare the laws of the United States not to be obligatory on her judges, such an act .would unquestionably be void; for it will not be pretended, that any member of the union can dispense with the obligation of the federal constitution: and, if it cannot be done directly, and by a general declaratory law, neither can it indirectly, and by by-laws dispensing with it in particular cases. This, therefore, is an express grant of the power, and would be sufficient for the purposes of the argument; but it is not all.
By the third article and second section, appellate jurisdiction of all cases arising under the constitution and laws of the United States, is reserved to the federal judiciary, under such regulations as congress may prescribe; and, in execution of this provision, congress has prescribed regulations for removing into the Supreme Court of the United States, all causes decided by the highest court of judicature of any state, which involve the construction of the constitution, or of any law or treaty of the United States. This is another guard against infraction of the limitations imposed on state sovereignty, and one which is extremely efficient in practice; for reversals of decisions in favour of the constitutionality of acts of assembly, have been frequent on writs of error to the Supreme Court of the United States.
Now, a reversal implies that it was not only the right, but the duty of the inferior court to decide otherwise; for where there is but one way of deciding, there can be no error. But what beneficial result would there be produced by the decision of a state court in favour of a state law palpably unconstitutional? The injured party would have the judgment reversed .by the court in the last resort, and the cause would come back with a mandate to decide differently, which the state court dare not disobey: so that nothing would eventually be gained by the party claiming under the law of the state, but, on the contrary, he would be burdened with additional costs. I grant, however, that the state judiciary ought not to exercise the power except in cases free from all doubt, because, as a writ of error to the Supreme Court of the United States lies to correct an error only in favour of the constitutionality of the state law, an error in deciding against it would be irremediable. Anticipating those who think they perceive in this, exactly what I have censured in those who assume the existence of the same power in respect to laws that are repugnant to the constitution of the state, but restrict the exercise of it to clear cases, I briefly remark that the instances are not parallel; an error in deciding against the validity of the law, being irreparable in the one, and not so in the other.
Unless, then, the respective states are not bound by the engage* inent, which they have contracted by becoming parties to the con *358 stitution of the United States, they are precluded from denying either the right or the duty of their judges, to declare their laws void when they are repugnant to that constitution.
The preceding inquiry may perhaps appear foreign to the point immediately before the court; but, as the act of 1815 maybe thought repugnant to the constitution of the state, an examination of the powers of the judiciary, became not only proper but necessary.
Then, laying the constitution of the state out of the case, what restriction on state sovereignty is violated by at once repealing any of the saving clauses in the statute of limitations? Those re-srictions are contained in the first article and tenth section of the constitution of the United States; and, as there is no pretence that a contract has been impaired, none of them can, even by the most strained construction, be supposed to be violated, except that which relates to ex post facto laws. But that was held, in Calder v. Bull, (3 Dall. 386,) to be applicable only to penal laws. The law in question not only relates to civil rights, but is not even retrospective. It is commonly said, that the statute of limitations does not run against any one, who is within the benefit of any clause of the proviso; but this is plainly inaccurate. It actually runs, — but ten years from the removal of the disability provided for, are given in addition to the original period, and this as a personal privilege in avoidance of the bar which would otherwise be decisive. If it were actually to begin to run only from the removal of the disability, the party would have twenty-one years from that period. Now, suppose it to be removed at the conclusion of the twentieth year, it will not be pretended that he would still have twenty-one years in addition: yet that consequence would be inevitable, were the statute not to begin to run before. So, where the disability is removed during the first year, the party will not be compelled to make entry within the ensuing ten; for the saving does not come into operation till the period which constitutes a bar in ordinary cases has elapsed: he must therefore, in such case, make his entry within the original period. Then, by putting in force a limitation which had all along been running against the plaintiffs, the act of 1815 did not operate retrospectively, but deprived them of a prospective exemption, which, having been gratuitous, cannot be said to have originated in contract. I am therefore of opinion that the judgment be affirmed.
Du so AN, J.
The only error assigned, is with respect to the saving clause in the act of limitations of the 26th of March, 1785, and the subsequent repeal of that part of the clause as to persons beyond sea, and the extension of the second section of the act of 17S5 by the act of the 11th of March, 1815. Preliminary questions are raised by the defendants in error, that the opinion on the act of limitations is a mere abstract one, — not having relation to any state of facts on the record on which the question could be re *359 levant; and, further, that as the effect of the limitation could only arise in the absence of title in the defendants, and that on the plaintiffs’ own showing, as to some of the lots, and the undisputed facts, as to others, they were not entitled to possession either in law or equity, however erroneous the charge might be on the limitation, still, if the plaintiffs showed no title, the judgment ought not to be reversed.
Admitting the relevancy of the opinion on the limitation acts, was that opinion correct? The discussion of this question has opened a wide field, as well on the retrospective operation of the repealing act of 1815, as on its constitutionality. Maintaining, as I do, the power and the duty of the court to decide on the constitutionality of all acts of the legislature, yet it is one which all courts will approach with caution and circumspection, and with every proper respect for a co-ordinate branch of the government, and with great reluctance will they pronounce an act of the legislature unconstitutional, and only where it comes in undoubted collision with the constitution of the United States, or with that of this state. But it is a duty, however irksome, which they áre bound to perform, without regard to personal considerations; for no principle can be better established, — none more conducive to personal liberty and security of property, — none of which the people of this free country can more justly boast, — none which so pre-eminently distinguishes our American constitutions over every other country and government, than the doctrine which has prevailed since their formation, in the courts of all these states from Maine to Georgia, that the people possess the sovereign right to limit their lawgiver, and that acts contrary to the constitution are not binding as laius. The concurrence of statesmen, of.legislators, and of jurists, uniting in the same construction of the constitution, may ensure confidence in that construction. Cole v. Virginia, 6 Wheat. 401. But, on the view I have taken of this case, I am not called upon to decide on the constitutionality of this repealing act, as divesting vested rights; for my opinion is, that the construction given to it by the Court of Common Pleas is erroneous; that it does not operate on the past time, nor continue the exemption and privilege granted to the absentee by the first act, but is altogether prospective, repealing, not making null and void the exception in that act, and extending the second section to persons beyond sea; and, as such, not only is constitutional, but most fit. I never could see the justice of this indulgence to absentees, and placing them in a better situation than the inhabitants; but it so pleased the legislature of 1785 to make this discrimination, and when the repealing act passed, it was their intention to put the inhabitant and absentee, thereafter, on the same footing, and nothing more; and, if they had such intention, it would have been necessary to do something more than simply to repeal the proviso, — they should have declared it null and void; for it is a well known construction *360 of statutes, even where the legislative power is unlimited, that the repeal of a former law, so far from undoing what has been done already, can only affect its future operation.- Even explanatory acts, uniformly operate in futuro, and cannot have a retrospective effect, except in cases where the original act might be doubtful, and various practice still left it so, or where it was completely open to legislative construction, by the absence of all vested rights; but no subsequent act can divest a right previously and legally acquired. 5th Am. Law Jour. 543. Now, a vested right .is where a man has a power to do certain actions, or to possess certain things, according to the laws of the land. Such a vested right had the plaintiffs: they had a right, on the 11th of March, to enter on the premises; they had a right of action. If this act had the effect given to it by the judgment of the Court of Common Pleas, it took away that vested right of action and of entry; it was, in fact, releasing the defendants from the right of action which the plaintiffs had ágainst them, not under the pretence of public necessity and without a just compensation; and before we should give any act such construction, the intention of the legislature should be explicitly and unequivocally expressed; for, if it is not, then from deference to the legislature, an intention so repugnant to the fundamental rights of property, and the eternal and immutable principles of justice, ought not to be imputed to the legislature of Pennsylvania. I, for one, will require positive and indubitable proof of such intention, — not general phrases, capable of a just construction, but which may be construed differently. I have bent the whole force of my understanding to the consideration of these two acts, and have taken into view the whole system of Pennsylvania legislation; all legislative acts, from the first settlement of the province down to the present hour; and, in conformity to the whole tenor of her legislation, and the exact letter of the law, certainly from its spirit, I am unhesitatingly of opinion, that it is not retrospective. The act of 1785 provides, “That no person or persons whatsoever, shall make any entry into any lands after the expiration of twenty-one years next after his title descended or accrued, nor shall any person have or maintain any writ of right, or any other real or possessory action or writ, or allege any seizin or possession of him, or his ancestors or predecessors, other than within twenty-one years next before such writ, action, or entry.” This is the only enacting clause; the third and fourth sections are provisoes. The third provides, “That persons now having any right, or their heirs, may enter and commence any actions within fifteen years after the passing of the act.” These fifteen years have been construed, not that the action is barred where there has been fifteen years adverse possession, but where, in addition to this number, there is a number making the whole adverse possession twenty-one years. This was decided in Packer v. Gonzalus, thus incorporating the proviso with the enacting clause, and *361 making it a part of. it. The fourth section contains a proviso usual in all statutes of limitations, as to feme coverts, lunatics, infants, and persons beyond sea. The act of March 11th, 1815, contains one short clause: “ The proviso in the fourth section of the act to which this is a supplement, so far as relates to persons beyond sea, and from and without the United. States, is hereby repealed, and the limitation contained in the second section of the act is herehy extended to persons beyond sea, any law to the contrary notwithstanding.” The act of 1815 is a supplement to the original act of 1785; whatever part of that act is not repealed remains in full force. The third section is not repealed, or rather the proviso to the second section. Now, by repealing the provisions in the fourth section, as to persons beyond sea, extending the limitation of twenty-one years in the second section to them, you make it what it is called, an act of limitations. On any other construction, it is an act of confiscation; for disguise the pill as we may, — soften its name to that of honest limitation, if we can, — we cannot escape from its consequences. It is forfeiture, a bill of pains and penalties; not pains inflicted on the person of the owner, but the penalty is a loss of his lands, and for what? not for omitting to do that which any law required him to do, but for not doing that which the law assured him he need not do. But the fair reading of it in ewtenso would make it an act, so far as respects persons beyond sea, passed the 11th of March, 1815. Every thing is thus reconciled, the integrity of the text preserved, and its exact letter conformed to. The whole course of authox-ities runs in favour of this construction, as well where the legislature is limited by constitutions, as where it is unrestrained and omnipotent, even though at variance with the words of the enactment. Gilmore v. Shute, 2 Show. 17. 2 Mod. 310. 1 Vent. 330. Couch v. Jeffries, 4 Burr. 2460. Turner v. Turner, 1 Wash. 139. Elliot v. Lyall, 3 Call. 218. Ogden v. Blachledge, 2 Crunch, 272, and other de-' cisions of the Supreme Court of the United States which I shall notice hereafter. Nothing can more strongly show the interpretation of courts of justice on acts of this description, than Gallego v. Quennel’s Administrators, 1 Hen. & Munf. 205. The words of the act were, £c that in all cases where thereafter an injunction shall be dissolved, the bill of the complainant shall stand dismissed of course with costs;” yet it was construed only to apply to cases of injunction, issued before passing that act. Commonwealth v. Duane, (1 Binn. 607,) proceeded on the same principles. The act of March, 1809, concerning libels, provided, thatil from and after the passing of that act, ilo person shall be subject to prosecution by indictment, for publications respecting official conduct.” It was held by the Chief Justice and Justice Brackenridge, contra Justice Yeates, (who was of opinion that it did not operate on that indictment which was found befoi’e its passage,) that the 'act put an end to the prosecution for the offence committed, and *362 carried to conviction before the passing of the act, but on which no judgment had been passed; but the Chief Justice said, that if the same words had been used as to a civil action, he would have thought himself warranted in giving them a different construction, because it would have operated in a retrospective manner to take away a vested right; but that there was a wide difference between a civil and a criminal action. Nothing could be better expressed than the opinion of my Brother Gibson, in Bedford v. Shilling, 4 Serg. & Rawle, 405. On this rule of construction he observed, “ It is one which the courts of this state have uniformly adopted, and it has been held almost against the express provisions of a statute, in a country whose legislation is uncontrolled by any constitutional check. If the legislature had intended that the progress of actions then existing should be arrested, they ought to have said so.” In The Society for propagating the Gospel v. Wheeler, 2 Gall. 150, the very instance of limitations was put by Mr. Justice StORY, who put a construction on the act wholly prospective, which he admitted was not according to its exact letter. When, under this act of 1815, did the time begin to run against the absentee? On the day it was signed by the governor. There is no antecedent time, no relation back: it is confounding all legal sense and all common sense, with respect to limitations, to construe the back words retrospective; or the time wholly past a forfeiture of title. As well might it go back to actions then commenced, nay, to land which the owner had recovered in a former action, under the benefit of the saving clause, annulling the exception in the first act; expunging it, as if it never had existed. The difference is palpable between repealing an act and declaring it null and void; the simple repeal leaving all acts and rights, and benefits enjoyed under it unimpaired, as they stood at the time of repeal; but if it declare all such null and void, they are nullified ab initio. Nemo potest mvlare consilium suum, in alterius injuriam, is a maxim as well of the common as of the civil law, and has been expressly applied to lawgivers. Dash v. Van Kleeck, 7 Johns. 504. The lawgiver cannot alter his mind to the prejudice of another; a law may be repealed by a lawgiver, but the right acquired under it does not cease. It would be an act of absolute injustice, to absolve with the law, all the effects it produced; it would create a new rule for things that were past. Laws may be repealed, but no power may recall the past; the rights acquired under them cannot be divested: such is the general law where there is no restraint on legislative power, how much stronger is the case, where, as in the United States, we have written constitutions. So far from the legislature claiming a constitutional power to annul privileges granted by a former law, they have solemnly disclaimed it. In the general banking act of March, 1814, they incorporated the banks until the 1st of Jlpril, 1825; but cautiously reserved to themselves the power to repeal their charters, by the eighteenth *363 section, in these words: “If it shall appear that the charters and privileges granted are injurious to the citizens of this commonwealth; the legislature shall have power to revoke all or any of them at any time they may think proper.” When, in 1824, they extended the time, they reserved the same power; thus recognizing the constitutional principle, that a privilege once granted, a right once vested, could not be annulled or revoked, unless the law granting them reserved the power to revoke and annul laws; which, as a rule of civil conduct, can never be brought to bear upon what occurred before the rule itself was’promulgated; for that, would be prescribing a rule for a case which had already happened, contrary to that before prescribed, or an interest already vested on events, which have happened. It is a law for the decision of civil cases, or facts which have happened on which it is to operate. There is a very able opinion of Judge Woobbury, in the case of Merril v. Sherbot, (New Hampshire, Adams, 203,) in which he draws the conclusion, that it is not warrantable to take away from a citizen a vested right, — a right to do certain acts or possess certain things, which he had already begun to exercise, or to the exercise of which no obstacle remained in the present laws of the land. The distinction between simple repeals and statutes declaring others to be void, obtained at a pretty early age of the law, has “grown with its growth, and strengthened with its strength.” By a statute made 1 and 2 Ph. & M., a devise to any spiritual corporation of lands for the advancement of piety, was made good and valid. This statute was repealed by 5 Eliz. c. 1. The devise was made after 1 Ph. & M,, and before the statute of Eliz., and declared good by all the judges of England; for where one statute is repealed by another, the acts done in the mean time are valid, but not if a statute be declared null and void: and for this principle the author cites 4 H. 7, and 11 H. 7. So, in West v. Wall, 3 Keble, 543, in avowry for quit rent, a special verdict, finding the statute of Ph. & M. and feoffment by Newport to the Bishop of Ely, who afterwards made a lease in frankalmoigne, and after the statute was repealed by statute 1 Eliz., yet, Per curiam, the thing having been done before repeal, is available. So, by the statute of Gloucester, it was provided that the alienation of a tenant by the cur-tesy shall not bind the same; and Lord Coke, in his commentaries on this statute, (2 Inst. 292,) observes, “ It is said that this extends to alienations made after, and that regularly, Nova constitute formam futuris importers debel, non preteritis.” So, in 2 Inst. 474, the statute of Westminster expounding the statute of Merton, that being an exposition of a former statute, does not take effect but from the time of making the exposition. So a will of lands before the statute, and the testator died afterwards, and the will held goo.d, though not executed according to the statute, for it is not to be taken by retrospection. Carville v. Carville, 2 Ch. Pep. 302. Price’s Ch. 77. So, in Ashburham’s Case, on *364 the statute of mortmain, it was decreed, on the opinion of all the judges in England, that’the statute should not avoid a devise in mortmain, where the will was made before, though the testator died afterwards. 2 Atk. 87, and Willet v. Sanford, cited Ambler, 262. But in the Supreme Court of the United States, to whose authority, in questions of this nature, we ought all to look up and be bound by, as the decision not only of a court of the last resort, but a court whose learning in every branch of jurisprudence is acknowledged, and whose extent of constitutional knowledge is certainly not surpassed by any court in any country, if it be equalled, in The Society for propagating the Gospel v. New Haven, 8 Wheat. 493, Mr. Justice Washington, who delivered the opinion of the court, thus expressed himself: “ The termination of a treaty does not divest rights of property already vested under it. If real estate be purchased, or secured under it, it would be most mischievous to admit that the extinguishment of the treaty extinguished the right to such estate. In truth, it no more affects such right, than the repeal of a municipal law affects the rights acquired under it. If, for example, a statute of descent be repealed, it has never been supposed, that rights of property already vested during its existence were gone by such repeal. Such a doctrine would overturn the best established doctrines of the law, and sap the very foundation on which property rests.”
The act of 1815, is simply a repeal of the saving clause, as to persons beyond sea. It repealed the exception in the act of 1785, but left all other parts of the law as it found them. The extension of the general act was redundancy. Without that, the second section would have embraced persons beyond sea, — it added nothing to the effect of the repeal. No other part of the first statute is repealed, except the saving in the fourth section, and that by express words; all except that stand; and the law does not favour a repeal by implication, for every repeal is a reflection on the wisdom of a former legislature, and is confined to repealing as little as possible of the preceding statutes. 11 Rep. 43. 1 Roll’s. Rep. 8. Foster’s Case, 1 Mod. 118. 4 Bac. Ab. 638. What is the operation of the saving clause, is the present inquiry. Is it to be construed fa-vourably? In Crosier v. Tomlinson, 2 Mod. 71, the action was assumpsit, and it was contended that this form of action was omitted in the saving clause of the statute of limitation, but the court said, “it was to receive a favourable construction, and this was certainly within the meaning; the provision restrains the severity of the enacting- clause, and restores the common law.” Then, until the 11th of March, 1815, the common law right of the plaintiff stood firm, and was unimpaired by the act of the 26th of March, 1785. It was not only a subsisting common law right of entry, but a right of action guaranteed by that act to the plaintiffs. Until ten years,' at least, after they landed on the ■American shores, the defendants had gained nothing by posses *365 sion. I am not called on to give an opinion on the constitutionality of limitation acts altogether retrospective; but still it is proper to keep in mind the decisions of the Supreme Court of the United States, in giving a construction to this act, as on the constitutional question they might be called upon finally to decide. Nor am I at present to give an opinion (though I must profess, on this subject, I have a settled opinion,) how far titles to lands derived by warrant, survey, and patent, constituting a part of the public domains acquired by individuals unden existing laws are contracts; yet there is the highest authority for this in Dartmouth College v. Woodward, 4 Wheat. 695. No one, as was stated by Mr. Justice StoRV, ever supposed that they were not beyond the reach of legislative revocation; and this was the established doctrine of the court. I avoid, further than is necessary by way of illustration, all those nice and difficult questions, — sufficient to the day, is the evil thereof. Yet, if even such a question should arise, and it is not to be anticipated, it would be well to consider that the legislature of this state, in the first act establishing a land office, April 9th, 1781. Pttrd. Dig. 369, sect. 11, enacted, “ that all and every the lands granted in pursuance of this act, should be free and clear of all reservations and restrictions, as to mines, royalties, quit rents, or otherwise, so that the owners respectively be enabled to hold the same as absolute unconditional property, to all intents and purposes whatsoever, and to all and all manner of profits, privileges, advantages belonging to or arising from the same, and that clear and exonerated from any charge or incumbrance whatsoever, excepting only a sixth part of all gold and of all gold and silver ore, for the use of the commonwealth, to be delivered at the pit’s mouth.” It is impossible to find, — our language does not afford, stronger words of absolute, unconditional, irrevocable grant. If to such a legislative grant, the legislature were afterwards to annex a condition of settlement, within a prescribed time, on pain of forfeiture, to him who would first seize and settle on it, it would deserve consideration, whether this would not be an act impairing the obligation of contracts. We cannot doubt what would be the decision of the Supreme Court of the United States, but if the law were to progress a step further, and provide, that if he had not settled it twenty-one years before the passage of the act, his right was forfeited to the first man who set his heart and his foot on it, I cannot believe but that such an act would startle the stoutest champion of legislative omnipotence. If a legislature can do this, the road is a short one. By repealing all the naturalization acts, congress might disfranchise millions whom the laws have made citizens; nay, more, the estates they had acquired would escheat to the state where situpted. It has so happened: congress, on the 26th of March, 1790, passed the first act to establish a uniform rule of naturalization. On the 29th of January, 1795, they repealed this act in toto, in express terms, and passed another law. *366 requiring different qualifications, and this they again repealed on the 14th of April, 1802. If the repeal produced the effect contended for, it would follow that all the naturalized citizens, from 1790 to 1802, were ipso facto again aliens. But I cannot suppose, that any court in the United States could consider it in the power of one legislature to nullify the acts of preceding legislatures, so as to divest a right secured by it. At least, this is the decision of the Supreme Court of the United States, who might be called on, as a court of error, to review our judgment in this very case; and although the grant under which the plaintiffs claim, is not under the act of 1781, yet it is derived from a most solemn engagement of the government. When, during the revolutionary war, on the change of government, the legislature considered that the salus populi required the divestment of the estate of the late proprietaries, they do this at least with some compensation, and they secured to that family all their private estate: they are ratified, confirmed, and established for ever, by the seventh section of the divesting act. Their title is held under this compact and confirmation. Now, could any subsequent legislature divest the Penn family, by repealing that act, or add to it a condition of settlement, or deprive them of it, because they had not before settled it? Would, or not, this be considered as a contract which the constitution of the United States prohibited the legislature from impairing? for if they could do it, then, by repealing the tenth section, which grants to that family one hundred and thirty thousand pounds sterling, they could have divested them likewise of that. In Fletcher v. Peck, 6 Cranch, 136, the principle stated by the Chief Justice and acted upon by the court was this, — ’“That one legislature was competent to repeal any act, which a former legislature was competent to pass; and, that one legislature cannot abridge the power of a succeeding legislature, and that this is a correct principle, which can never be controlled with regard to general legislation; but if an act be done under a law, a succeeding legislature cannot undo it. — the past cannot be recalled by the most absolute power.” If the construction of the Court of Common Pleas be the true one, then the law takes this property immediately and directly from one man and gives it to another; and certainly nothing could convince me, said the Chief Justice, in Enstein v. Bowman, 6 Binn. 471, that it was the intention of the legislature to take a man’s property without a reasonable compensation, because it not only would be an act of injustice, but a violation of the constitution, which prescribes limits to legislative power. The legislature are the judges of the great occasions when it may be expedient to break in on the rights of property, making just compensation; but to take away property, without compensation, is beyond their power. Such, I take, to be the decided opinion throughout the United States. And again, in Pickering and others v. Rutty, 1 Serg. & Rawle, 511, he says, “ The people have not intrusted *367 their representatives with authority to commit sueh an act of manifest injustice, as to take away the property of an individual without compensation.” On the 11th of March, 1815, the plaintiffs were entitled to the possession; on that day they are divested of their right of entry, and of action, and all the proprietary interest vested in the defendants; for twenty-one years’ adverse possession vests the right so much in the possessor, that he becomes the owner in fact and in law. It is not only a negative bar to the plaintiffs, but takes away their right of possession, and gives a positive title to the defendants; for there is a marked difference between our act of 1785, and the statute of Jac. 1. That statute takes away the entry, but our act takes away the writ of right, and every other real and possessory action; so that twenty-one years’ possession, like sixty years under the statute of Hen. 8, is a sufficient title against all the world. 3 Black. Com. 196, and in Green v. Biddle, 8 Wheat. 76, where the Kentucky statute, as to payment for improvements, was decided to be unconstitutional, and where much was said about taking away the remedy and leaving the right, (a matter, I must confess, beyond my comprehension, where the right is a right to enter on lands,) Judge WASHINGTON thus strongly expressed himself: “ Nothing, in short, can be more clear, on principles of law and reason, than that the law which denies the owner of the land a remedy to recover the possession, when withheld by any person, how'ever innocently he may have obtained it, or to recover the profits of it, or which clogs bis remedy for the recovery of such right, destroys the right itself, if there be no remedy to recover the thing.” The law supposes there is a right to it. A right to land includes the right to enter on it, to recover the possession of it by suit, to retain the possession of it, and to recover the issues and profits. For the sake of the argument, it must be admitted that the plaintiffs had made out an unquestionable right, that there was no impediment but the act of 11th of March, 1815; and then the argument must be, that, by the operation of that act, they lost it that very day,— not by any omission to do what any law' required, but by operation of that act; which law, at the same time it took it from them, vested it in the defendants, and without any compensation, transferred their absolute right to the defendants, who had then no right. The legislature of 1785 provides, that the limitation shall not commence against any owner beyond sea, until he returns to the United States, and then allows him ten years to prosecute his right. The legislature of 1815 says this exception was mischievous and impolitic in our predecessors. We differ from them, and declare, that the time shall begin to run from 17S5, that it has run out, and say to the privileged man — your title is extinct; we think fit to vest it in another; and this in the twinkling of an eye, without any previous warning. The owner remonstrates against this flagrant injustice: he says to the lawgiver — why not give me no *368 tice of the change in your intention ? Why lead me into this snare, by guaranteeing my right, until the expiration of ten years after I set foot on your shore ? The legislator points, in answer, to his thunder, while the poor man points to the constitution. Thus the man who arrives in the Delaware from Ireland, say on. the 10th of March, 1815, with a fair title, to possess the land which his relation bequeathed to him, on the 11th is despoiled of it: when the sun rose, it was his; when it set, the right had departed from him, — he is despoiled of it, and though with a rich inheritance, he is a beggar, with a helpless family, and in a strange land. This is the very essence of tyranny; sic volo, sic jabeo, slel pro ratione voluntas. The stranger will not, I trust, point in vain to our constitution. But such iniquity is not to be imputed to our legislature. There is no such stain in Pennsylvania legislation; the door of justice is not shut: she has, in the words of the bill of rights, kept her courts open to those men for the injury done them in their land. Absence is no crime, delay is no culpable omission; it is excused by the law itself. I am grieved to think there is even a doubt entertained of the intention of the legislature. Consistently with all constitutional legislation, they might, and I insist they have done no more, than place the absentee on the footing of inhabitants. They might legislate prospectively, or diminish the time that had yet to run. It was ingeniously attempted to discriminate between voluntary and involuntary disability; between absence beyond sea, and infancy and lunacy, This is not a new attempt, but it has never prevailed; for courts have always held that it would be mischievous to refine on the subject, or make any distinction between voluntary and involuntary disabilities. When the disability is removed, the statute begins to run, but not before. The legislature, by the act of 1815, repealed it. This act, as to absentees, is to be construed as an act on that day, including all the provisions of the act of 1785, except as to persons beyond sea: all are to be taken as one provision, as parts of the same general system of limitation. I disclaim what has been called in the argument judicial legislation, but I claim and exercise the right of judicial construction, and I construe these acts by rules which have obtained for ages in the construction of statutes. The legislature intended it to be a system of limitation; they so call it, and it is our duty so to construe it: they use a legal term, we must presume, in a legal sense. From the very legal definition, it must be, in the nature of things, prospective. It may be, in some sense, retrospective, as it legislates on rights or contracts then existing; but as to the limitation of time in pursuing the remedy, statutes are always prospective. Mr. Sergeant, in his very valuable treatise on Constitutional Law, has assigned the true reason why retrospective limitations are considei'ed as unconstitutional, while prospective ones are thought to be constitutional: in the first they take away the remedy and the right; in the second, *369 they merely modify the remedy. Serg. Con. Law, 352, 355. It is, and I speak it with the most perfect confidence, in all prospective. The past time cannot be recalled by the most absolute power. Limitation, as it is taken in law, is a certain time prescribed by statute, within which.the demandant in an action must prove himself, or some of his ancestors, seized. Co. Litt. 116. And in Terms de la Ley, 280, limitation is an assignment of a space of time, within which he that will sue for any lands, ought to prove thatihe or his ancestor was seized of the thing demanded, or otherwise he shall not maintain his action, which assignments are made by divers statutes,«as the statutes of Merton and Westminster, 1st ch. 28. 32 Id. 3. And there is no British statute, from the first statute of limitation, 20 H. 3, down to the present day, which does jret prescribe a time future. Prescription of a time in which an act may be done, cannot be of a time that is past; prescribed, that is, apparent beforehand; for a bare resolution confined in the breast of the legislature, without manifestation- by some actual sign, cannot properly be a law. It requires that the people, its objects, should be notified. But herede legislative manifestation of time and sign would be delusive: they prescribe one time, and after that time has passed, they enact, because you have not done that which they proclaimed you need not, your title is extinct. When it was stated by the counsel of the defendants, that Pennsylvania had done so in other acts of limitation, as in the act of 1785, I own I was distressed; for a series of pernicious enactments of that nature would certainly create a pause, and present a difficulty; but on a close examination, I may safely challenge anyr man to show the solitary instance, in which they have deviated from the highway of legitimate limitation, into the crooked path of retrospective limitation. The first act, of 1705, as to equitable rights, which is one of the alleged instances, and which was in force unknown to the legislature, the bench, and the bar, as an act of limitation, was never heard of in the courts of justice until the case of Penn v, Kline. If any construction can now be hazarded on this anti-? quated act, it appears to me to have been solely to give the seven years’ possession of an equitable title in the hands of a man, who, had there been a court of chancery to have compelled the conveyance of the legal title, could have called for it, the legal title, without conveyance from the holder. When that case went up to the Supreme Court of the United States, in Kirk v. Penn’s Lessee, 9 Wheat. 287, it was held not to be in the nature of limitation. The Chief Justice said, it would be difficult to give a retrospective construction to it; and Mr. Justice Johnstone, who differed from tire rest of the court, considered it as one of prospective limitation; and he very justly says — if it'had been retrospective solely, it had not a single case to work on: and on the effect of its repeal, by the act of 1785, I entirely concur with him in the observation, that its repeal at that time could have no eilect on the previous *370 rights of the parties. And the other instance, of the section in the act of 1785, with respect to abandoned settlements and unexe-cuted warrants, has always been considered as merely declaratory. Chief Justice M'Kean, in Smith v. Brown, 2 Smith, 175, held that the powers, with respect to settlements, presupposed a usage that a recovery might be had on a prior occupation, when there had not been an abandoned possession within seven years before suit brought. Right by occupation was always founded on continuity of possession, and residence: this was the spark which kept the pre-emption right alive, and when this was extinguished, the imperfect right died in much less time than seven }'ears. It is a principle of the law on this subject, that improvements must not have the smallest cast of abandonment; and as to unexecuted warrants, it is believed that no ejectment could at anytime be supported on them, unless, indeed, they contained a eertaint)1, nearly equal to a survey. What would be generality of description, must be particularized by survey. The warrant may be generally descriptive, but it is the survey which identifies the land. Nothing could more retard the settlement of the country than these pocketed warrants: to keep them locked up, is locking up all the land in the adjacent country; for no man could tell whether the owner would sweep to the right or the left, — whether he would run north or south, east or west; and the warrant, in its very terms, was to be surveyed, within six months. Further time was an equitable indulgence, perhaps not very conducive to the prosperity of the country: besides, that provision did not divest the right of the warrantee, for after the seven years a survey made on vacant unappropriated lands would be good. The acts with respect to Connecticut intruders, were acts of state policy protecting the territory of the state from invasion, under pretence of foreign titles. The very possession was an invasion of the sovereignty of the state; a high oifence. .The transfer was made an indictable crime. The object of all these acts was, to cut up the Connecticut title by the roots; but this affords an evidence of the solicitude of the legislature, not to hazard unconstitutional limitations, even under great excitement, for all these regulations of limitation are purely prospective. On the 11th of March, 1800, fifteen days before the bar of limitation, under the act of 1785 had taken effect, the law is repealed as to Connecticut intruders, and there is something worthy of attention in this. It is not simply a repeal of the former act as to those intruders, — it is shortly repealed, and declared .null and void. The legislature, it is to be presumed, knew the difference between a simple repeal and declaring an act null and void; at any rate, by rendering the act a nullity, they deprived a man of his right. No right was acquired by length of possession, for no length of time could give the criminal possessor the legal title. Every day’s continued possession was a new crime. The acceptance of a conveyance, at any time, was indictable, and which, *371 with respect to all the other parts of the state, included the time •in which entry might be made for three years; it touched >not any vested right of the possessor, but barely suspended for a time the the limitation; and when the legislature restored the limitation to lands within the Connecticut claim, they gave a new time to the Pennsylvania holder to prosecute his right. There are many other acts of limitation. The act of the 4th of Jlpril, 1798, limits the time'for which judgments should continue a lien on real estates, and so, as to suits, to be brought against the sureties of public officers. The judgments are not to continue a lien more than five years after passing the act. On the bonds of public officers, it is of bonds thereafter to be taken, and gives seven years after cause of action accrued; so of writs of error and in distributing estates among the relations of intestates: and the act of 1781 limited the time for bringing suits for land against the state, to ten years after the publication of the act. Instead of a series of ex post facto limitations, we find a uniform, systematic course of just legislation, always giving time to prosecute their elaims; and it would be most unreasonable that there should be a deviation, in this instance, of so flagrant a nature. It is not to be found in the letter or spirit of the repealing clause. A recent instance furnished a slrong evidence of the sense of Pennsylvania legislation on this subject. An attempt was made, in the last session of the legislature, to carry a law, repealing a decision of this court on the construction of the act of 1S04, as to sales of unseated lands for taxes, and the limitation of five years allowed the owner, to bring his ejectment to try their validity, which was that the time only began to run from the time of adverse possession taketAufider the sale; but it was abortive; and a law was passed witholtopposition, prescribing a form of action where no possession had been taken, but allowing the owner two years, after passing the act, to bring his action..
I am not driven to the necessity of declaring this act unconstitutional, for its enactment, in this light, is, as I think, not only constitutional, but just — most just. I only take these views for the purpose of showing the opinions of other courts, and of the Supreme Court of the United States, whoso exposition of the constitution of the United States is conclusive on all state courts. And, first, under the act for opening the land office, already stated, do not the owners of land hold by grant from the state a free and absolute right of property? and whether this would not be a contract, whose obligation the state could not impair, either by our own bill of rights or the constitution of the United States, ought to be considered. In Dartmouth College v. Woodward, 4 Wheat. 629, it was stated, by Mr. Justice Stokt, to be “the established doctrine of the court, that titles to land constituting a part of the public domain, acquired by grant under existing laws by private persons, are certainly contracts of civil institutions; and that no one ever supposed but that, when acquired bona fide, they were *372 beyond the teach of legislative revocation; and by the word contract, in that court, is understood every executed agreement between individuals, or between individuals and a state, by which a right is vested, and every executory agreement which confers a right of action, or creates a binding obligation, in relation to subjects of a valuable nature, and which may be asserted in a court of justice, but it does not comprehend the political relations of á government, and its citizens, civil institutions, which may be liable to change with circumstances, and to be modified by ordinary legislation, which deeply concern the public, and -which, to preserve good order, the public judgment must control.” 4 Wheat. 627, and see also 6 Cranch, 136, Serg. Con. Law, 379, Rawle’s View of the Const. of the U. S. 131. The property of an individual may be taken for public use, on just compensation, and the legislature are the sole judges; but the legislature has no power to transfer the property of A. to B., although it may appear even beneficial to the state that B. should have it. Vanhorn’s Lessee v. Dorrance, 2 Dall. 384. Rawle, 130 In the Society for pro* pagating the Gospel, &c. v. Wheaton, 2 Gall. 181, Judge Story puts this very Case of limitation: “It may be admitted,” he observes, “that if this were a mere statute, barring the action in the realty, after a reasonable time, under the exercise of legislative discretion, its constitutionality could not be questioned; but if the legislature were to pass an act, by whose iimitations.all actions on past disseizins were to be barred, without any time allowed for the commencement thereof \ it would be difficult to support its constitutionality, for it would be completely retrospective on vested rights.” And Chief Justice Marshall, in delivering the opinion of the court in Sturges v. Crowninshield, 4 Wheat. 207, puts the case of limitation in a personal contract: “ If in a state where six years may be pleaded in bar to an action on a contract, a law should declare that contracts already in existence, and not barred, should be construed to be within it, there would be little dif-culty as to its unconstitutionality.”' This does not intrench on the power of the legislature to shorten or suspend limitation laws, because this takes away no vested right. So, statutes made for curing defects in legal proceedings, by confirming acts, though it might be said, the party had a right to take advantage of the error; but the answer to this is, that there is no vested right to take advantage of a mistake or error. Foster’s Ex. v. Essex Bank, 16 Mass. R. 270. We must constantly keep in view, that this is a case of landed property vested by grant in one set of individuals, attempted to be divested, and vested in another. The clause in the constitution of the United States, declaring that private property shall not be taken for public use without just compensation, is declaratory of a great fundamental principle of government, and any law violating it must be deemed a nullity; not only because it is inconsistent with the constitution, but against natural right and justice. Scott *373 v. Platt, 17 Johns. 255. If the legislature intended to nullify, and had constitutional power, why not speak out? why simply repeal? why leave it in any ambiguity? The case of Whitman v. Hapgood, (10 Mass. Rep. 437,) confirms the construction I put on this act. A statute of that state, of 1805, after prescribing what shall be evidence of an advancement to a child or grandchild, repeals all former acts falling within its purview; but it was held, thaft a deed made prior to that statute, and which, by existing laws, would have been evidence of an advancement, should have the effeet of a repealing clause, notwithstanding; and that for this reason, — statutes are not to affect the past transactions of the subject of legislation. If the contrary construction were to prevail, then the legislature might prevent the recovery of just debts by retrospective limitations: they might, by repealing the fourth section of the limitation law. strip infants, feme coverts, and lunatics of their lands; and then another legislature might repeal the whole act of 1785, and restore the ancient owner. And what could prevent a future legislature from repealing the act of 1815? and thus, instead of certainty of title, on which the happiness and prosperity of every country depend, we would not hold, what our patents purport, an absolute, unconditional estate, but floating and precarious tenancies at will, — fluctuating possessions, tossed to and fro by every gust of wind: a state of things not congenial with any just idea of property, and which the freeholders of this state are not prepared for. It would subvert the very end of government itself, which is, to give to every one his right, — and of all law; for the benefit of all law is, that it gives a rule of conduct. Then indeed we might say, with Mr. Justice Patterson, (in Vanhorn's Lessee v. Dorrance,) “ We are all tenants at will of the legislature,” and exclaim with him, “ Wretched situation, precarious tenure!” The boast would be a vain one, of property and its security, of'courts and of constitutions, and of calling ourselves freemen; but, thanks to Almighty God, this has not been the course of Pennsylvania legislation; very different has been her course. On the most sedulous search, I cannot find one solitary instance of limitation wholly retrospective; on the contrary, I find the most scrupulous and praiseworthy attention to prevent any collision with vested rights, and that there is a constant adherence to this fundamental principle of government.
As to the policy of the original saving, I have nothing to urge in its defence. The legislature, pursuing all former acts of limitations thought proper to adopt it; and having made the exception, wisely or unwisely, it is not to be presumed that a future legislature would cause it to bear on the excepted cases, or act on the time that was past; undo rights secured under It. It is enough for me to say, they have not done it; and on that ground my judgment is, that the Court of Common Pleas gave an erroneous opinion on the effect of the repealing clause of the act of 1815.
*374 The very able argumeut of the counsel of the defendants in or* ror, and the disagreement on the bench, have rendered the investigation unavoidably tedious. It was due to the strong arguments and the fervid zeal with which they were urged, to assume nothing and to examine every thing, with the most patient, laborious, and unbiassed consideration. This I have done faithfully, and the result of my labour has been, to myself at least, most satisfactory; and the labour has been well employed, if I have, in any degree, succeeded in rescuing from reproach the act of 1815, and wiping off the stain which a retrospective construction would fix on Pennsylvania legislation. I would have felt deep regret and mortification, to have found such a blemish recorded in our statute books, and pain, in being called to pronounce sentence of condemnation on a provision so repugnant to the constitution of this state and the United States: though those whose great learning I esteem, and whose judicial opinion I respect, may not agree with me in the justness of my conclusions.
Thus far we have proceeded on the assumption, that the plaintiffs have shown a right of possession; but it is asserted by the defendants, that they have the legal title, and the plaintiffs no equity, and if they had an equity, it was only to be administered on their doing, or offering to do, certain acts, and until they were done, or offered to be done, chancery would grant no relief; and that, in Pennsylvania, the possession should not be destroyed, and if on the undisputed state of facts appearing on the record, the court should bo of opinion that the plaintiffs were not entitled to recover, then, as no question of limitation could arise, the court would not reverse the judgment and award a venire facias de novo, on an irrelevant opinion, or do so useless a thing as order another trial; and as these points arise on the record, it is the duty of the court to give their opinion on them. On the statement of undisputed facts, or the plaintiffs’ own showing, did it prove a subsisting right, either in law or equity? To understand this, it is necessary to state whether the claims were legal or equitable. The ejectment was for an undivided moiety of four lots, with the buildings, numbered, in the general plan of Easton, 77, 78, 79, and 80, admitting the defendants to be tenants in common with them under the will of Dr. Ledlie. These lots were the private estate of John Penn and Richard Penn. No. 79 had been conveyed to Dr. Ledlie; No. 77 and 78 he held by improvement, and No. 80 by possession, and on judgments obtained against his executors, No. 79 was sold to John Cooper, 77 and 78 to Samuel Sitgreaves. The lots were conveyed by deed, duly acknowledged by the sheriff to the purchasers. This took place some time in 1796. John Ross afterwards purchased from Cooper and Sitgreaves the western half of these lots; the Penns released the ground rents on lot No. 79, and conveyed 77 and 78 to John Ross, and No. 80 they sold and conveyed to Sitgreaves. Cooper, if this sale was not fraudulent, *375 obtained the title to No. 79, and Sitgreaves to Nos. 77 and 7S, whatever it was of Ledlie’s; and John Boss by conveyance from the Penns the legal title. We are at some loss to know what is meant by an improvement of an appropriated tract of land. Im-’ provement could give no right of pre-emption; but I presume it was held under some understanding or contract implied, that the improver should have the right of pre-emption, or perhaps by agreement from the proprietaries’ agent, on which no money had been paid.
The Penns held the legal title in No. 80, and that is vested in Sitgreaves by the conveyance. Ledlie held but a naked possession; the Penns were under no obligation, legal or moral, to sell to Ledlie, or to his heirs or devisees. Sitgreaves, though an executor or administrator, had power equally with any stranger to buy, and the Penns to sell and convey to him; and Sitgreaves was not prohibited by the policy of any law, or any equitable doctrine, from buying at sheriff’s sale any part of Ledlie’s estate. There was no evidence indicative of any fraud in the sale. The testator left his estate much embarrassed, his personal property not exceeding one hundred and fifty dollars, exclusive of some trifling debts due to him. Whatever doubts might rest on a purchase by an executor at an under value, with effects in his hands to pay the debts, none can on such a sale as the present, where I do not find any allegaticü of direct fraud; for there is no principle of law which will invalidate the title of a trustee, whefe the law has taken the property out of his hands, and he has purchased from one having authority to sell, as at sheriff’s sale. Provost v. Gratz, 1 Peters, 370. Arid, as to the alleged irregularity, the return of fieri facias, not condemned, and subsequent inquisition and condemnation, this never could affect a purchaser; and, on that head, the opinion of the court was quite correct, as to the full effect of the sheriff’s sale, as to Nos. 77, 78, and 79. There is no extrinsic testimony stated; and certainly the proceedings on their face exposed no circumstance or mark of fraud. The only matter alleged to vitiate the sale of Nos. 77 and 78, is, that it was to an executor. We have seen this is no disqualification. As to 79, it is not even alleged that.Cooper had notice of any thing fraudulent. Boss could protect himself by Cooper’s want of notice, even if he had notice himself before his purchase. The competitors of the defendants, as to 77 and 78, never had the legal title; and, if they had any claim,-it could only be enforced in a court of equity. If the Penns had sold to a stranger, could he have been disturbed after this long delay? No court of chancery could have compelled the Penns, or their alienees, on a bill filed, to convey to them after so long abandonment, where no"money had’been paid; where there was no obligation on Ledlie, or his representatives to pay, where he had not left assets, and where the property, in the mean time, had become of much greater value. An *376 executory contract so imperfect and undefined, would be abandoned by laches, or forfeited by neglect and dormitancy; and that not arising from the bar of any positive limitation. Infancy or being •beyond sea could form no excuse for the non-operation of this execu-tory contract, where performance, on their parts, was so essential to the rights of others. I am satisfied that a court of chancery would not interpose, after this monstrous delay, after this gross neglect to lend its aid for the completion of a contract, even when the purchaser had paid a part of the purchase money, without evidencing a fixed and marked intention to carry his contract into execution; and, with regard to these equitable rights and reliefs, our courts only exercise a borrowed jurisdiction. Necessity lias compelled the judges to adopt the maxims and principles of a eourt of equity ; therefore, what is established as a rule in a court of equity, must be considered as law here. But we ought to be well satisfied, before we adopt them, that they are settled rules of property in chancery. Lessee of Barnes v. Hart, 1 Yeates, 231, by Mr. Justice BRADFORD, the general rule is, that time is not of the essence of a contract; but where a considerable leugth of time has elapsed, after the party demanding a specific performance has failed to perform on his part, and the demand is made after a long delay, and change in the title and value of the property, and there is want of mutuality of obligation in the respective parties, no court would allow one party to hold another bdtnd where the obligation was not reciprocal; or to hold himself prepared to avail himself of all favourable contingencies, without being affected by those that turn out unfavourable. Brashier v. Gratz, 6 Wheat. 528. If this is a rule in a court of chancery, in a country where property is generally improved, and the value more fixed and ascertained, how much stronger is the reason why the rule should obtain here, where so much property remains without improvement, and where lands are constantly rising, (until within a few years.) It is essential to justice that the contract should be executed in some reasonable time; for it is ridiculous to talk of making a man compensation, by giving him the interest of the purchase money; and where, as to lots No. 77, and 78, there was no express contract, the grounds unimproved and unproductive, no obligation on the party asking the performance to perform his part; where he has died, leaving no assets to pay, and no estate, and no one bound to pay but at his own option, where, if the property fell, he never would pay, nothing could be more pernicious to society, — to this community, particularly, where real estate is daily improving, and daily changing hands, and where it is. the interest of all to give facility to alienations, than that a man who enters into a contract, should take his own time to perform it. This is not the doctrine of equity. At the end of twenty years, if it would not be considered as abandoned, I know not when it would; and thus the ven-dee would be bound to keep the estate in abeyance unimpaired *377 for the purchaser and his descendants for ages to come, and that even when he has received no part of the purchase money; and it never can be too often repeated, that the common law courts in Pennsylvania are. not in the distribution of equity without any certain fixed principles, for they are as much bound by the rules of property established in a court of equity, as they are by the most certain maxims of the common law. On every principle of well defined equity, these defendants may claim of the court to have the title as it stood at law; and I am well aware, that it would be as unjust to let these claimants come in and sweep away all, — . improvements and all, — purchase money and all, — as it would have been iniquitous to strip them of their rights, if they had any, under the pretence of retrospective limitations. Clearly as to 77 and 78, if the contract were even more recent, the plaintiffs never could sustain this equitable action of ejectment, without tender of the purchase money paid to the Penns, without tender of what had been paid in discharge of the testator’s debt, and thp ■ sums were capable of ascertainment, if not at the commencement of the action, certainly at the time of trial, and all the costs up to the time of tender; for the fiction on which this equitable action is supported is, that equity supposes that to have been done which good conscience requires should be done. But equity would not require these defendants to convey, unless they were reimbursed. The generality of the maxim is frequently mistaken, for nothing can be looked upon as done, butthat which ought to have been done, and ought to have been done in due season, and not what might have been done. Burgess v. Wheat, 1 Eden, 186. Now, here, as chancery would not have relieved but on these terms, these terms should have been offered and the tender made, and the money brought into court; but if this had been done, still another question in equity would arise.
These purchasers were tenants in common with Ledlie’s devi-sees, and the plaintiffs in error say, that by these purchases the defendants beeame their trustees; and this certainly is the strong point of the case:, without this, they have not an inch of ground to stand upon. What would be the result ? In that case, the cestui que trusts could not recover the property in the hands of thé trustees, without paying all proper sums advanced in execution of the trust, as well as the original debt and interest Baker v. Plankinhorn, C.C., U. S., Oct. 1807, Whart. Dig. 382. This principle is laid down by Chief Justice Kent, in Vanhorn v. Funda, 5 Johns. Ch. R. 407, 416, “Where two devisees, tenants in common, are in possession of an imperfect title derived by them from a common ancestor, one of them cannot buy an outstanding title, so as to dis-seize or oust his co-tenant, but such purchase will inure to their common benefit, subject to an equal contribution to the expense, including all the benejicial and permanent improvementsP The tender of die sums paid to the sheriff; the proportion of the-'' *378 purchase money paid to the Penns, with interest should he paid into court with the costs, and then the verdict entered conditionally for the plaintiffs, that if on an issue directed by the court to ascertain the amount of useful and beneficial improvements, with the interest, deducting a reasonable rent, the plaintiffs should pay the ascertained amount by a certain day, to be stipulated by the court, judgment to be entered for the plaintiffs without costs; but if the amount so found should not be paid at the time stipulated, then judgment on the verdict to be entered for the defendants. But this equity fcould only arise on the sale of the sheriff being invalidated, on the ground of actual fraud. John Boss, the purchaser, even if that were proved, could not be affected without express notice. He bought from one who held the legal title, on a judicial sale confirmed by the court, and nothing but actual notice could impeach his title: he would hold it, purged of the fraud. I speak of No. 79, of which Ledlie held the legal estate; for then if the sale was fraudulent, and Boss purchased with notice of the fraud, Cooper having notice of and participating in it, (of which I cannot discern the vestige of evidence,) the plaintiffs would be entitled to a verdict.
As to Nos. 77 and 78, afler such a lapse of time, my doubt has been whether the plaintiffs could be let in on any terms, — be the sale by the sheriff valid or invalid; but I incline to think, if the sale were invalid, chancery would suffer them to come in, with the co-tenants, on the terms I have mentioned: contribution to all that has been fairly laid out in acquiring the title, payment of purchase money to the Penns, and for beneficial permanent improvements. Nothing will bring a court of chancery into action, but a pure equity and reasonable diligence. The strongest equity may be forfeited by laches, or abandoned by acquiescence; for in chancery there is always a limitation. Youst v. Martin, 3 Serg. & Rawle, 423. Peebles v. Reading, 8 Serg. & Rawle, 484.
The claimant in opposition to the legal title should not delay asserting his right, as a stale claim will meet with, little attention. Delane v. Delane, 7 Br. P. C. 379. Sugden, 444. Where a contract has lain dormant for a period much shorter than this, and no step taken to complete it; and particularly where the property, by subsequent events, has become more valuable, where nothing has been done, where there is no mutuality, and no time fixed for performance, — this is not such an agreement as equity would enforce. 1 Madd. Ch. 323, and in Peebles v. Reading, before cited, under such circumstances, it was decided that the delay of thirteen years was unreasonable. But in such a trust as this, it is the dictate of reason and justice, and a rule in equity, that equity will not interpose unless the plaintiff consents to do that which justice requires, and that would be the full contribution I have stated. The only consideration that would exclude from the recovery of .valuable im-urovements, would be where a man has acted fraudulently, and is *379 ■conscious of the defect of his title, and, with that consciousness on his mind, makes improvements with the design of improving ces-tui que trusts out of his estate. In such a case as this, payment of all laid out in securing the title, and for all beneficial permanent improvements should be made a sine qua non to the recovery of possession; and this is settled in Moody v. Vandyke and others, 4 Binn. 35.
As to No. SO, the plaintiffs have no pretence in law or equity. Dr. Ledlie had hot a spark of right: he stood, as to the Penns, as a trespasser and intruder. The Penns were under no obligation to sell to his devisees; Sitgreaves under none to buy from them. By his buying from one devisee, he did not become tenant in common of that to which neither had a right; for neither could claim any title under the will of the testator, because he had no interest in, nor was he seized of any thing by'virtue of any thing, express or implied.
I have hesitated as to the relevancy of the opinion bn the statute of limitations, as to No. 79. At one time my impression was, that it could not act as to IT, 78, and 79, as the plaintiffs have neither done, nor offered to do, what was incumbent on them, to do, either before the bringing of the action or on the trial of the cause. My impression is unchanged; they have not put themselves-in a situation to call on- the defendants to surrender the possession. But as the right to No. 79, of which Dr. Ledlie held the legal title, is involved in the inquiry, the question is different; and considering it without relation to the sheriff’s sale, and its validity depending on a question of fraud; and the opinion of the court on the bar of limitations, naturally rendering it unnecessary for -the jury to inquire into the fact, was conclusive of the whole case. This was a direction to the jury, that limitation was an insuperable bar to the plaintiffs’ recovery. I agree with the Chief Justice, that the judgment should be reversed, and a venire facias de novo awarded.
Another case has occurred under this act, on which we have heard another very able argument; but my opinion has not been changed, but rather confirmed, by the view taken by the counsel on that argument. It has been assumed, that the repealing clause would have the same effect with or without the extending’ clause. It is on that ground the reason of my opinion is founded, and it shows that I offered a safe challenge, when I challenged to the proof of any instance of retrospective limitation enactment. The industry of the counsel has been in vain employed in the search, and he has totally failed. The cases of oertioraris to justices of the peace and writs of error being taken away, and in which the High Court of Errors and Appeals has been abolished, are those exercises of legislative power which no man can justly deny. The new organization of the courts under the present constitution, put this court in the power qf the legislature. It was not a court established by the constitution, — it was not recognizéd by it, — and *380 its abolition was not forbidden. The inhibition of certioraris was one of those general provisions incident to legislation: it divested no vested right of property. This right had been decided by a competent tribunal not to be in the party against whom the judgment was. It might as well be contended, that transferring jurisdiction from one court to another, as, from the Common Pleas to the District Court, or from this court to the District Court was unconstitutional. It must be by a very subtle course of argument that this could be called in question as trenching on the constitution; whereas, to authorize a court ever to exercise this difficult and delicate trust of declaring an act unconstitutional, it must be, where the infraction of the constitution is palpable; for in adoubtful case, it never can be justified. In these cases, it would be a usurpation of legislative power. These acts were not prohibited to the legislature by the constitution of the United States, or of this state. They impair no contract; but the constitution of the United States prohibits the legislature from passing any law impairing the obligation of contracts, in the same words that it denies to them the power of passing bills of attainder; and the bill of rights, in this state, denies to the legislature the power to pass any law impairing the obligation of contracts. The people, in the exercise of their absolute and sovereign authority, have declared that this principle should for ever remain inviolate. That instruction, paramount to all law, has exempted this, (in a voice that cannot be misunderstood, and must be obeyed,) out of the general powers of government. The act of 1781 is the fundamental right under which the people of this state hold their landed estates, as absolute, unconditional property, to all intents and purposes a contract between the people and the government of the most solemn and binding nature. The first act of this state government is the charter of the proprietaries, — a charter irrevocable, a tenure which cannot be changed, until the individual surrender back his right to the government, or the public good requires its application to public use, and even then not without just compensation. I will just add, that warrants for lands issued under the authority of the state, at a special .session of this court held at Sunbury, were solemnly decided to be solemn contracts between the commonwealth and each individual. Attorney General v. The Grantees, 4 Dall. 339.
I have not found any thing better expressed, on this inherent power of the judicial department, than the opinion of Judge Charlton, in the Supreme Court of Georgia, in Greenfield v. Ross, Charlton’s Rep. 176: “The power claimed by that department, of deciding on the constitutionality of laws, is a point inseparable from its organization. It is a power which results from the federal and state compacts; without it, all the horrors of legislative omnipotence would instantly stare us in the face, followed by a prostration of those wise, checks, a legitimate exercise of that. *381 power imposing upon all wicked usurpation, on the sound rights of the people. In England, they have no constitution; hence the parliament possesses omnipotent power: but a constitution stands upon a different basis. It emananates directly from the will of the people, in whom, from the very nature of things, the sovereign power necessarily resides. As soon as the people have given existence to this constitution, it becomes the supreme law of the nation, or the state: it is paramount to all other authority, and that mighty fiat, — and that fiat only which gave it life, — can announce its destruction. These are political tenets which cling to and are dear to the hearts of all true Americans. They are the tenets dear to Americans, because who can oppress or be oppressed, under the benign and energetic influence of a written constitution, which designates and guarantees all the rights of man, and which raises "up every arm in defence of them? From passion, from unprincipled ambition, from the illusions of ignorance, from the ebullition of political acrimony or misguided zeal, it is very easy to perceive the possibility of an unconstitutional act of the legislature. What, then, is the remedy? A recourse to the people’s vengeance? Must the people be called upon to defend, in their aggregate capacity, that compact and those privileges, which flowed directly from the source of their volition? If this is the remedy, our boasted republicanism is nothing more than systematic anarchy; and it would be therefore better for us to repose in the thorny protection of an absolute monarchy. Is the remedy found, in the patient endurance of the evil, until succeeding legislatures think pro- ■ per to repeal the unconstitutional enactment? This would be worse than popular insurrection, because it presupposes an outrage upon the constitutional rights longer than ought to be borne by American citizens. The remedy can only be found, then, in the wisdom and independence of the judicial department. Here the passions, # the feelings, and the interests which may and do sway deliberative bodies, cannot be found. This department is aided' by all the lights which cautious and dispassionate consideration can afford; and it is governed by maxims of jurisprudence which, apertis foribxis, offer a secure asylum to every citizen whose weakness or injuries solicit admission and protection. This department cannot deviate from those fixed principles, which for ages the approbation of mankind has stamped with the seals of truth and authority. In this respect, the judicial is unlike the legislative department, whose functions are regulated’by the caprice of an arbitrary discretion. Under this view of the judicial department, it is surely the best, the safest, and in our republic can be the only mediation between a citizen and an unconstitutional act of the legislature.”
The observation, that where the judges are elected by the legislature, they cannot decide on the constitutionality of the acts of the legislature, — because the creature cannot be greater than the •creator, — the learned judge coasiders as a mode of reasoning ab~ *382 horrent to the constitution. It is true that the judges are elected by the legislature; but, when elected, they constitute a department co-equal and co-ordinate with the legislature. This opinion is closed with a proper caution to judges,-that where it remains doubtful whether the legislature have or have not trespassed on the constitution, the cohflict ought to be avoided, because there is •a possibility, in such cases, of the constitution being on the side of the legislature.
I refer, likewise, to The Trustees of the University of North Carolina v. Foy and Bishop, 1 Murphy, 58. In the year 1789, the legislature granted all escheated estates to the university; and, in 1800, it was repealed, on the ground that the former act was judged to be void, as being contrary to the constitution of the state.
Judgment reversed, and a venire facias de novo awarded.