[PHILADELPHIA, February, 2, 1831.]

## The COMMONWEALTH *against* RUFF.

It is not necessary that the warrant of a county Treasurer for the commitment of a delinquent collector of taxes, should show upon its face, that such previous proceedings were had under the act by virtue of which it was issued, as authorised the Treasurer to issue it. Nor is it necessary that it should appear, that at the time and place mentioned in the warrant issued by the commissioners of the county to the collector, at which he was required to pay over the taxes collected by him to the Treasurer, the board of commissioners were in session, ready to make "abatement or allowance for mistakes" in the duplicate, or for "indigent persons" therein named and assessed, who were unable to pay, &c.

It is not necessary to the validity of such a warrant, that it should run in the name of "The Commonwealth of Pennsylvania." It may issue in the name of the county Treasurer.

HABEAS CORPUS.

THE whole of this case is embraced by the opinion of the Court, which was delivered by

KENNEDY, J.—This was a writ of *habeas corpus ad subjiciendum, &c.* to the Jailor of the city and county of *Philadelphia*, returnable, *January,* 21st, 1831. By the return it appeared, that the relator, *John S. Furey,* has been committed under a warrant from the Treasurer of the county of *Philadelphia* for being a delinquent collector of taxes of *Dock* ward in the city of *Philadelphia.*

The warrant is in the following words:—" *Philip Peltz,* the Trea-
" surer of the county of *Philadelphia,* to the Sheriff of the county of
" *Philadelphia,* greeting. Whereas, on the eleventh of *March,* A. D.
" 1830, the commissioners of the county of *Philadelphia,* appointed
" *John S. Furey,* collector of the county taxes for *Dock* Ward in the
" city of *Philadelphia,* assessed in the year eighteen hundred and
" thirty, and on the tenth day of *June,* A. D. 1830, they delivered to
" the said *John S. Furey,* a duplicate of said taxes, amounting to the
" sum of eight thousand and fifty-two dollars, and ninety-one cents,
" due on the said duplicate, and the said *John S. Furey* has neglect-
" ed and refused to pay over the same, but has paid over only the
" sum of six hundred and ninety dollars, leaving a sum of seven thou-
" sand three hundred and sixty-two dollars, and ninety-one cents
" unpaid and unsettled, for which the said *John S. Furey* is delin-
" quent. You are hereby commanded to take the body, and to seize
" and secure all the estate real and personal, of the said *John S.*
" *Furey,* and make return of this warrant, and of what you may do
" in pursuance thereof at 10 o'clock, on *Saturday,* the fifteenth day
" of *January,* A. D. 1831, at the office of the county commissioners,
" and notify the said *John S. Furey* of the time and place of the said

(The Commonwealth *v.* Ruff.)

" meeting.   Given under my hand and seal in pursuance of the Act
" of Assembly, of the eleventh of *April*, 1799, this eleventh day of
" *Jannary*, A. D. 1831."

" *Philip Peltz*, County Treasurer."   [Seal.]

It is said, that this warrant is void because it does not appear from
the face of it, that any such previous proceedings were had under
the act of assembly therein mentioned, (see 3 *Smith's S. L.* 393.) as
would authorise the treasurer to issue it : That all these proceedings,
if they ever did take place, ought to have been recited in the body of
the warrant ; and especially ought it to have appeared, that at the
time and place mentioned in the warrant, issued by the commissioners
of the county to the collector, at which he was required to pay over
the taxes collected by him to the treasurer, agreeably to the 15th
section of the act already referred to, the board of commissioners
were in session, ready to " make abatement or allowance for mis-
takes" in the duplicate, or for " indigent persons" therein named and
assessed, who were unable to pay, &c. and that after this being done,
the relator might have proceeded to " demand and receive the re-
mainder of the tax."

It is admitted, that the tax was assessed ; that *Furey* was appoint-
ed the collector of it, and that he received a warrant and dupli-
cate for this purpose from the commissioners.   Indeed, this appears
from the recital contained in the warrant of the treasurer.   It fur-
ther appears, that *Furey* paid none of the money received by him
upon his duplicate to the Treasurer on the thirteenth day of *July*,
1830, which was the day fixed for that purpose in his warrant from
the commissioners ; nor did he pay any for some time afterwards,
when he paid six hundred and ninety dollars out of eight thousand and
fifty-two dollars, and ninety-one cents.   With this last sum he was
charged on the books of the commissioners, according to the direction
of the 12th section of the act aforesaid.   He is credited with the six
hundred and ninety dollars paid, but it is alleged, that *Furey* has a
right to claim an " abatement or allowance for mistakes" in his dupli-
cate, and for and on account of " indigent persons" assessed, who were
unable to pay, and that it does not appear upon the face of the war-
rant of the treasurer, or otherwise, that a board of the commissioners
was in session on the thirteenth *July*, 1830, at the place appointed
in their warrant to the collector, to afford him the opportunity of
claiming and having such " abatement and allowance" made to him ;
and that until all this be shown, it must be taken, that the treasurer
had no authority to issue his warrant.

It does not appear, however, nor has it been positively asserted,
that *Furey* has any just ground for claiming an " abatement or allow-
ance" for and on account of the causes set forth in the act of the
legislature, made in this behalf.   If he has no good reason for claim-
ing it, it ought not to be allowed.   On the contrary, if he is justly en-
titled to any allowance, it ought to be made.   Why has not this been

(The Commonwealth *v.* Ruff.)

done? How could it have been done without the application of *Furey?* How were the commissioners to know that he had such a claim, if he failed to mention it to them? If such a right existed, he might avail himself of it, or waive it as he pleased, inasmuch as no one could be injured thereby, but himself. If, however, he intended to assert it, it was certainly incumbent upon him to apply to the commissioners, and to make his case known to them. It would be most unreasonable to presume, that the commissioners prevented him from making this application. It may be observed, that at the same time or place appointed by the commissioners in their warrant to *Furey* for making his application for such "abatement or allowance," the performance of a positive duty, which he owed and had undertaken for the benefit of the public was enjoined, that is, the payment to the treasurer of all moneys collected and received up to that time upon his duplicate. In this respect he was required to appear and make a return of what he had done upon the warrant put into his hands. This, it seems, he neglected, or perhaps, his counsel would say, that neglect was not to be imputed to him in this, because it has not been shown, that the Treasurer attended at the time and place appointed to receive the money.

The duty and situation of a collector here, is not unlike that of a constable, into whose hands an execution is delivered. By the 12th section of the act of the 20th of *March,* 1810, giving Justices of the peace jurisdiction in certain cases where the claim of the plaintiff does not exceed one hundred dollars, it is provided, that on delivery of an execution to any constable, an account is to be stated in the docket of the justice, and also on the back of the execution, of the debt, interest and costs, from which the constable shall not be discharged, but by producing *to the justice,* on or before the return day thereof, the receipt of the plaintiff, or such other return as may be sufficient in law. Upon failure to make such return or in case of a false return, the justice is directed to issue a summons against the constable, requiring him to show cause why an execution should not be issued against him for the amount of the one put into his hands. Here the constable is charged in the justice's docket with the amount of the execution delivered to him, as the collector is charged in the commissioners' books with the amount of the duplicate delivered to him; and in order to discharge himself from the amount of the execution he is to make a return of it to *the justice* on or before the return day. Now is it possible, that in a proceeding against the onstable to obtain execution against him for not having made return *to the justice,* of the one put into his hands, that it must be proved or *even alleged,* that the justice was attending at his office on the return day, to receive the return of the execution from the constable? Such a thing was never thought of, yet there can be no doubt, but the absence of the justice from his office, and its being shut up from the time that the execution came into the hands of the constable, until after the return day of it had elapsed, would sufficiently excuse

him for not having made a return of it on the proper day. But such an apology will not be presumed. On the contrary, it will be presumed, that there was nothing to prevent him from performing his duty, and thereby discharging himself from his official responsibility. If he were so prevented, he must prove it. So in the case before us, *Furey* was charged in the commissioners' books with the amount of the duplicate upon the delivery of it to him. He was required to make return by a particular day, to pay over all moneys received, and at the same time report any mistakes, which he in the mean time might have discovered in the duplicate, as also all " indigent persons" therein assessed, who were unable to pay, that he might be exonerated *pro tanto.* This was a positive duty enjoined upon him ; he was just as much bound to do all these things as the constable in his case, in order to obtain relief. Upon what principle can it be presumed for him, that he appeared at the time and place appointed to pay over the moneys received by him to the treasurer, and to claim of the board of commissioners an " abatement or allowance" for the causes before mentioned, but that the treasurer or the commissioners were not there? Even in the case of one man being bound to pay a sum of money to another at a particular day and place, he must show that he was in attendance at the time and place appointed for the payment of the money, having it with him prepared to pay it, although he to whom he was to pay it, did not attend at all, otherwise he will be in default, and liable to be sued upon his obligation for the money, and compelled to pay costs as well as the debt and interest. If such be the effect of an obligation growing merely out of a contract made for the benefit of a private individual ; how much stronger must the reason be for requiring it of him, who has undertaken to perform a duty, in which the *public* is interested, and arising out of an obligation created by both *law* and *contract?*

It is apparent, that the law would defeat itself, if after having imposed a duty, which was not performed, it were to presume, without any, the least shadow of proof, that some legal impediment had intervened to prevent the discharge of it. It is well settled, that if a legal excuse does exist for not having performed a legal obligation, either of a private or public nature, it must not only be declared, but proved. In the present case had it even so happened, that a board of the commissioners was not in session on the day at the proper place, and that the collector had attended ; still he would not thereby have been absolved from all further responsibility. Such an occurrence might readily happen from sickness, or other unavoidable cause without any sort of blame attaching to any one. In such a case I would consider it the duty still of the collector to seek an early opportunity of meeting the commissioners, when sitting as a board, to transact business, and to lay before them his reasons for " abatement or allowance," and obtain their decision, which ought certainly to be given as if it had been done on the day first appointed. I think it right that the collector should call in this case upon the commis-

(The Commonwealth *v.* Ruff.)

sioners, because they can know nothing of his case until he shall have informed them. And if his claim be well founded, every principle of justice requires, that it should be allowed. . I would also think it right that the same course.should be pursued in a case, where some unavoidable cause has taken place to prevent the collector from attending the commissioners to claim allowances, &c. on the day assigned in his warrant. But if the collector lies by and neglects to apply for relief, until the time within which he is required by law to collect and pay over the whole amount of his duplicate, has elapsed, I see no reason why he should not be proceeded against by the treasurer as a delinquent collector, in the same manner as if an abatement or an allowance had been made to him.

The court think that enough has been shown in this case to authorise the treasurer to issue his warrant against *Furey*.

It is urged in the last place against the validity of the warrant, that its style is not " the Commonwealth of *Pennsylvania;*" and that this is required by the 12th section of the 5th article of the Constitution of the state. To judge fairly of the requisition contained in this section as to this matter, it will be necessary to ascertain the object and design of it. From the first section of this article of the constitution, it appears clearly, to have been the intention of the framers of that instrument to provide exclusively for the establishment and regulation of the judicial power of the commonwealth. All the preceding sections of this article are confined to courts, and the judicial officers therein named, and provided for, among the number of which it will not be pretended, that a county treasurer is embraced. After declaring and setting forth the several courts and officers in which the judicial power of the commonwealth shall be vested, and the tenure by which most of the officers therein named shall hold their respective offices, it proceeds to delineate and distribute the jurisdiction and power to be exercised by each, until we come to the 12th and last section, which in some degree prescribes the form that is to be observed in the exercise of this power, as also in the means necessary to be used in order to accomplish it. The commencement of this section is in the following words :—" The style of all process shall be, the Commonwealth of *Pennsylvania.*"

It is a rule in the construction of all instruments, that the subject-matter of them must be closely attended to, and not overlooked. By the application of this rule we are necessarily led to the conclusion, that the word " *process,*" in this place was intended to refer to such writs only, as should become necessary to be issued in the course of the exercise of that judicial power, which is established and provided for, in this article of the constitution, and forms exclusively the *sub-ject-matter* of it. If there remained any doubt of this, it is removed by the universal practice both legislative. and judicial, which has prevailed in the construction of the remaining.part of this section, which declares that " all prosecutions shall be carried on in the name of the Commonwealth of *Pennsylvania,* and conclude *against the*

(The Commonwealth v. Ruff.)

*peace and dignity of the same.*" In the act passed the 22d of *April,* 1794, " for the prevention of vice and immorality and of unlawful gaming," &c. the legislature have given a form for a conviction in such prosecutions as are therein directed, to be commenced against those, who shall violate the provisions of the act; in which no regard seems to be had to this clause of the constitution.    Many summary prosecutions and convictions have occurred under this act without such conclusion, and been afterwards removed by *certiorari* into the courts of Common Pleas, as also some of them into the Supreme Court, where the legal knowledge and ingenuity of counsel have been employed in assigning errors, but such an exception, as that the prosecution did not conclude " against the peace and dignity of the Commonwealth of *Pennsylvania,*" was, as I believe, never heard of, and I dare say, never thought of.    It has never been considered as extending to prosecutions, other than those carried on by indictment found in some of the courts referred to in this fifth article, and where, anterior to the revolution, it was the rule and practice to conclude such prosecutions " against the peace and dignity of our lord the king."    It was a requisition of the constitution of 1776, purposely framed and designed to meet the state of things produced by the revolution, in which the majesty of the people under the name of the Commonwealth of *Pennsylvania* was to be displayed, as exercising the reins of government, instead of the king of *Great Britain.* From that it has been introduced into the present constitution without intending to change its effect.    It was no doubt intended, as has been said by the counsel for the commissioners, in support of the warrant of the treasurer, to be a substitution of the name of the Commonwealth of *Pennsylvania* for that of the king, in all process and prosecutions, where it was necessary to use the name of the king before the revolution.    The warrant is literally what the act of assembly would seem to require, the *warrant of the county treasurer,* given *by him* under *his hand and seal.*    The prisoner must be remanded.

*P. A. Browne,* for the prisoner, cited the *Commonwealth* v. *Alexander,* 6 *Binn.* 176.

*Dallas* and *T. Sergeant,* for the Commonwealth, 3 *Chitty Crim. Law,* 338. 12 *Serg. & Rawle,* 348. 1 *Chitty Crim. Law,* 39. *Jacob's L. D. Hawk, B.* 2 *Ch.* 16.    1 *Chitty Crim. Law,* 109.    9 *Serg. & Rawle,* 277, 4 *Yeates,* 205, 1 *Serg. & Rawle,* 92. 1 *Chitty Crim. Law,* 335.